Charles H. DECHERT, R. H. Pattison, Dave Pince, Stan R. Roden, Alan R. Pattison, Dick Pattison, Paul A. Christensen, Kenneth O. Fleenor, Myron C. Jarvis, George Pingetzer, Wayne Wilson, Lloyd Dechert, Ward Whitman, Stanley Bryant, R. L. Medow, and Farrell Grough, Individually and as members of the Midvale Irrigation District, on behalf of themselves and all others similarly situated, Appellants (Plaintiffs below),

v.

George CHRISTOPULOS, Wyoming State Engineer, the United States of America, acting through the Department of Interior, and Bureau of Reclamation, The Riverton Valley Irrigation District, and the LeClair Riverton Irrigation District, and all others similarly situated, Appellees (Defendants below).

No. 5144.

Supreme Court of Wyoming.

Jan. 7, 1980.

Rehearing Denied Feb. 21, 1980.

Henry A. Burgess of Burgess & Davis, and Dan B. Riggs of Lonabaugh & Vanderhoef, Sheridan, for appellants.

John D. Troughton, Atty. Gen., and Jack D. Palma, II, Sr., Asst. Atty. Gen., Cheyenne, for George Christopulos, Wyoming State Engineer, appellee.

Charles E. Graves, U. S. Atty., and Tosh Suyematsu, Asst. U. S. Atty., Cheyenne, Sanford Sagalkin, Acting Asst. Atty. Gen., and Nancy B. Firestone, Regina L. Sleater and Carl Strass, Attys., Dept. of Justice, Washington, D.C., for U. S., appellee.

Houston G. Williams of Williams, Porter, Day & Neville, P. C, Casper, for Riverton Valley Irrigation Dist. and LeClair Riverton Irrigation Dist., appellees.

Before RAPER, C. J., and McCLINTOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., Retired.*

ROSE, Justice.

This case principally concerns Fremont County, Wyoming, litigants and is mostly a contest among members of and the Midvale Irrigation District (hereafter Midvale), plaintiffs-appellants, and members of and the Riverton Valley (hereafter Riverton) and the LeClair Riverton (hereafter LeClair) Irrigation Districts, defendants-appellees. The central issue is whether, in 1917, the State of Wyoming, through the Board of Land Commissioners (hereafter the Board), with the approval of the State Engineer, validly granted Riverton and LeClair certain preferential rights to the waters of the Big Wind River. Midvale initiated this action in 1977 following a drought, in response to which, and by authority of certain agreements, another defendant-appellee, the Wyoming State Engineer, gave preferential treatment to Riverton and LeClair through his regulation of the waters of the Big Wind River. Appellants-Midvale complain that this preferential treatment redounded to their disadvantage and is contrary to law. This suit also involves the United States, which is named as a defendant below. The role which the United States plays will be discussed, infra.

BACKGROUND

This appeal concerns water rights primarily under appropriation Permit No. 7300[1] which authorizes a diversion of sufficient water from the Big Wind River to irrigate 331,708 acres of land in Fremont County, Wyoming. In 1906, the permit was granted by the State Engineer to Wyoming Central Irrigation (hereafter the Construction Company), a private construction company, as a part of a plan to undertake construction for and irrigation of withdrawn acreage under the Federal and State Carey Acts, now 43 U.S.C. § 641, et seq., and § 36–7–101, et seq., W.S.1977.

By 1913, the Construction Company, under its contract with the Board, had completed two major canals as part of the irrigation project. One of these, Wyoming Canal No. 2, served land now within Riverton, and the other, LeClair Riverton No. 2, served land now within LeClair. The Construction Company experienced difficulties and, with certain exceptions, in 1913 surrendered to the Board its right to proceed further with its agreement and its water rights under Permit No. 7300. This was accomplished according to the authority contained in § 36–7–322, W.S.1977.[2] Ex-

---

*ROONEY, J., having recused himself from participation in this case, GUTHRIE, J., Retired, was assigned, having been retained in active judicial service pursuant to Article 5, Section 5, Wyoming Constitution, and Section 5–1–106(f), W.S.1977, by order of this court entered on January 1, 1979.

1. Other permits were subsequently granted and are involved in this litigation but need not be specifically referred to in the body of the opinion. The Tripartite Agreements, which will be thoroughly considered herein, mention the following permits: Water Permit Nos. 7300, 7301, 7302, 7303, and 7404, and Reservoir Permit Nos. 874, 875, 876, 877, 892, 1408, 1425, and Enlargement No. 2208.

2. The statute provides, in relevant part:

"... *provided, however, that the board may, in its discretion, accept from any parties unable for any reason to fulfill the terms of their contract with the state, the full release, relinquishment and surrender of any rights acquired from the state under and by virtue of said contract, and may thereupon abrogate the same and release said parties from the conditions of the said contract and bond, and may proceed in its discretion to*

cepted from this surrender was the Construction Company's right, under Permit No. 7300, to irrigate land served by Wyoming Canal No. 2, but, in 1916, these water rights were assigned to Riverton's predecessor in interest. Further, in 1916, the Board assigned to LeClair's predecessor in interest such part of the rights contained in Permit No. 7300 as was necessary to irrigate the land served by the LeClair Riverton No. 2 Canal—also under and by authority of § 36–7–322. These two assignments, consisting of the right to irrigate 28,122.63 acres of Permit No. 7300, did not convey reservoir rights then held or owned by the Board, nor was any mention made of any preference right to waters of the Big Wind River.

Thus, by 1916, predecessors in interest of both Riverton and LeClair owned canals, together with Permit No. 7300 rights to irrigate the 28,122.63 acres of land within their boundaries from the Big Wind River's direct flow. The Board retained its right to withdraw water under Permit No. 7300 to irrigate all of the remaining acres. Even though the Board had not yet developed the means to exercise this right, it was anticipated that the Big Wind River might one day prove incapable of providing sufficient water to irrigate the entire 331,708 acres encompassed by Permit No. 7300.

In anticipation of this contingency, certain "Tripartite Agreements" were entered into among the Board (with the approval of the State Engineer) and the predecessors in interest of Riverton and LeClair. These agreements resulted in giving the two irrigation districts a preferential right over any future Permit No. 7300 water users to the use of as much direct-flow Big Wind River water under Permit No. 7300 as is authorized by law. Other permits were also involved in the contracts but these need not be specifically discussed. See, fn. 1, supra.

After the Tripartite Agreements were entered into, and specifically on February 15, 1919, the State transferred its water rights to irrigate the remaining 303,585.37 acres under Permit No. 7300 to the United States. The United States became and is the owner of this portion of the last-mentioned water rights, which it holds as a fiduciary for the use and benefit of the members and irrigators of the Midvale Irrigation District.

In 1977, there was insufficient water to meet the requirements of the three irrigation districts and, therefore, the State Engineer, acting under the authority of the Tripartite Agreements, satisfied the claims of Riverton and LeClair on a preferential basis. This, claims Midvale, left it short of water and the suit by Midvale questioning the validity of the Tripartite Agreements followed.

*Did the State of Wyoming, Riverton and LeClair have legal authority to contract with respect to a priority of use under Permit No. 7300?*

■ The Tripartite Agreements were entered into on behalf of the State by the Board and approved by the State Engineer. Appellants claim that the Board lacked authority to adjust water priorities, urging this function to be vested in the Board of Control under Article 8, Section 2, Wyoming constitution.[3] Appellees argue that the Board, in its *proprietary* capacity, held such interest in the Permit No. 7300 water rights as would permit it to contract with Midvale and LeClair concerning preferences and was, therefore, not acting in a regulatory capacity.

It is our judgment that the appellees' position is sound, and when the Tripartite Agreements were entered into, the State, through the Board, held title to Permit No.

enter into a new contract with other parties, if such there be, for the completion of the works so surrendered. . . ."

**3.** Article 8, Section 2, provides:
"There shall be constituted a board of control, to be composed of the state engineer and superintendents of the water divisions;

which shall, under such regulations as may be prescribed by law, have the supervision of the waters of the state and of their appropriation, distribution and diversion, and of the various officers connected therewith. Its decisions to be subject to review by the courts of the state."

7300, *as a water-right holder*, subject to the strictures of the Federal Carey Act, ". . . to make all necessary contracts to cause the said land to be reclaimed . . . ." 43 U.S.C. § 641.

When land is to be reclaimed under the State Carey Act, the State Engineer must (all other laws and rules and regulations having been complied with) respond to the application of the party contracting with the Board concerning the issuing of water permits to facilitate the irrigation of Carey Act lands. § 36–7–303, W.S.1977. Once the contract for the construction of the irrigation works is entered into, the permit has been issued by the State Engineer to the contractor and default occurs, the statute provides—as has been noted—for the surrender to the Board "of any rights acquired [by the contractor] from the State." Supra, fn. 2. The contractor, when the permit was issued, was a water-right holder, supra, and when the Board acquired the contractor's right under Permit No. 7300, it acquired the same interest in the permit as the contractor owned, i. e., the Board became a water-right holder by reason of the contractor's surrender.

When it entered into the Tripartite Agreements in this capacity, the Board was not acting in violation of any of the duties constitutionally delegated to the Board of Control. It was simply acting as a permittee—a trustee for the settlers—[4] negotiating with the only other existing permittees concerning water rights under a common permit.

It must be remembered that when the Tripartite Agreements were executed, the only irrigators under Permit No. 7300 were the appellees-districts, who, together with the State, owned *all* of the rights under this permit. The Midvale Irrigation District did not come into being until many years later. The parties to the agreements could, therefore, lawfully agree among themselves to the subordination of the rights of one party to the rights of others. Such subordination

of water rights to the rights of another was recognized by this court in *Stoner v. Mau*, 11 Wyo. 366, 72 P. 193, reh. den. 11 Wyo. 366, 73 P. 548 (1903).

The rights of the Board as a trustee-holder-of-rights under a permit to appropriate water must not be confused with the *regulatory* authority of the Board of Control over the use of the waters of the State. The Board of Land Commissioners' right to contract as a permittee with other permittees with respect to the priority rights of the parties under a common permit comes about as an incident of the Board's obligation as a trustee of water rights which were acquired through the Construction Company's surrender under the Carey Act. These rights are not related to those granted the Board of Control by the Constitution in Article 8, Section 2.

The actions of the Board in entering into the Tripartite Agreements were consistent with its trust or agency obligations (*State v. Twin Falls-Salmon River Land & Water Co.*, fn. 4, supra) to assure that the appellees-irrigation districts could count on an adequate water supply for their lands. The record shows that appellees' water supply was in fact jeopardized when the Construction Company failed to complete the construction of irrigation works sufficient to meet the needs of the 331,708 acres scheduled for reclamation under agreement with the State. Through the passage of House Joint Resolution No. 3, Thirteenth Wyoming Legislature, the State acknowledged its role and the responsibility it felt to the settlers when it said:

"Whereas, said settlers were induced to purchase said water rights upon the representations of the State and the conditions of said contract between the State and said company [Wyoming Central Irrigation] and the State is at least nominally obligated to protect said settlers in the acquisition of good and valid water rights."

---

4. *State v. Twin Falls-Salmon River Land & Water Co.*, 30 Idaho 75, 166 P. 220 (1916 on rehearing).

Thus, in conveying the preferential rights under Permit No. 7300 to the appellees-districts, the actions of the Board were wholly consistent with those functions prescribed for it under the State Carey Act to foster the reclamation of public lands and were in tune with the sentiment of the legislature that some action "be taken on the part of the State for the protection of said settlers relative to said water rights." (House Joint Resolution No. 3, Thirteenth Legislature, 1915).

### The Appurtenant-to-the-Land Issue

Appellants argue that the Board could not subordinate (to Riverton and LeClair) any water rights which it held because such water rights were appurtenant to the land, which land the Board did not own. In support of this argument, appellants cite § 36–7–501, W.S.1977, of the Wyoming Carey Act, which provides:

"The water rights to all lands acquired under the provisions of this act shall attach to and become appurtenant to the land as soon as title passes from the United States."

The appellants cite us to no facts of record which would tell us when or whether the title to the lands subject to irrigation under Permit No. 7300 passed from the United States to the State of Wyoming.

It is clear from the stipulated facts that the State of Wyoming, on February 15, 1919, *relinquished* unto the United States all of its interest in lands to be irrigated under Permit No. 7300, to wit: some 303,-585.37 acres. But the question is—what title did the State have in the lands covered by Permit No. 7300 prior to the relinquishment? Did it have *fee title*?—or did it just have some unidentified and contingent rights in the withdrawn land which it came by through the Federal and State Carey Acts? Had the United States Government in fact previously conveyed title to the land so that, under § 36–7–501, W.S.1977, the water had become appurtenant thereto? We don't know, and the record does not answer the question for us. The parties omitted this fact from their stipulation and

no evidence was introduced to establish it. Furthermore, there is nothing about the Federal and State Carey Acts which would lead us to the conclusion that title passed to the State by operation of law.

Since it is the affirmative contention of the appellants that the Districts and the Board could not enter into the Tripartite Agreements because the water rights had attached to the land, it became their duty to point to the facts in the record which support the premise that prior to the execution of the Tripartite Agreements title to the land had passed from the United States. This the appellants have not done. Furthermore, we have not discovered facts of record or law which would command such a conclusion.

### Were the Tripartite Agreements void for lack of consideration?

■ The consideration flowing from Riverton and LeClair to the State in the Tripartite Agreements was a relinquishment of their interest in reservoir permit rights under the reclamation project. This is not in dispute. What is in dispute is whether Riverton and LeClair had any valuable reservoir rights to assign to the State.

The original irrigation company was granted a number of reservoir permits designed to benefit the project's eventual entrymen by allowing them to use stored water. Appellants argue that an analysis of the chain of title of these permits reveals that the predecessors in interest of Riverton and LeClair never owned them. Appellees respond with the argument that the reservoir permits were designed to benefit the *entire* irrigation project and that, therefore, Riverton and LeClair did have claims to rights under those permits, even if title to the permits was in the Board. After all, say the appellees, the Board had a statutory mandate to manage lands involved in the Carey Act project. § 36–7–102, supra.

■ No special findings of fact were requested under Rule 52(a), W.R.C.P., and in this circumstance the trial court's judgment carries with it every finding of fact sup-

**1044**

ported by the evidence. *Skinner v. Skinner*, Wyo., 601 P.2d 543, 545 (1979); and *P & M Cattle Company v. Holler*, Wyo., 559 P.2d 1019, 1024 (1977). We hold that the evidence supports a finding that LeClair and Riverton, prior to the Tripartite Agreements, had some claim and interest in the reservoir permits which had been granted to benefit the entire irrigation project and that a transfer of these rights was sufficient consideration to support the Tripartite Agreements.

This conclusion makes it unnecessary for us to consider whether the State could have granted LeClair and Riverton preferential rights without consideration.

### Do the Tripartite Agreements have "probative value?"

Appellants' third argument is phrased, "The Tripartite Agreements dated February 24, 1917 lack probative value." The brief contains copies of the agreements and the argument section points out that the "signatures" are typed in on these documents. Appellants thus argue that the validity of the instruments is called into question and present argument as to why the rules of evidence or the Wyoming Comprehensive Curative Act, § 34–8–101, et seq., W.S.1977, are not available to solve this problem. Appellees-districts urge in the argument section of their brief

"that the copies in evidence are true copies of the County Clerk's records made at a time when photocopies were not used, but such records were typed by the County Clerk from the originals filed for recordation."

All appellees then argue that the rules of evidence and the Curative Act, supra, solve any problem which may exist.

Since we are a court of review, it becomes imperative that we know what, if anything, happened in the trial court with respect to this issue. Turning to appellants' statement of the case, we find some seven pages of facts. The facts recite that in 1917 the Tripartite Agreements were executed. They also recite that the State, by the agreements, assigned preferential

rights to the appellees' predecessors in interest. In the pretrial stipulation of facts, it is related that the agreements were recorded in 1917 in the Fremont County Clerk's Office. Nowhere in appellants' brief are we told what happened to the "probative-value" issue at trial or even if there was such an issue at trial.

Rule 5.01, W.R.A.P., outlines the requirements of an appellant's brief. Subsection (3) requires:

"A statement of the case. The statement shall first indicate briefly the nature of the case, the course of proceedings; and its disposition in the court below. There shall follow a statement of the facts relevant to the issues presented for review, with appropriate page references to the record;"

Appellants have failed to inform us of how or even whether the trial court addressed the "probative-value" issue. In addition, they have failed to refer to page numbers of the record containing facts relevant to this issue. (Appellants have included in their briefs copies of the agreements. But there is no reference to whether or where in the record facts relevant to the omission of written signatures appear.)

From the pretrial statement of facts, as well as from the fact that appellants themselves offered the agreements into evidence, a question arises as to whether the "probative-value" issue was or was not preserved for appeal. In any case, Rule 5.01(3), supra, places upon the appellants the burden of showing how this matter was treated in the trial court. This burden has not been discharged.

Rule 1.02, W.R.A.P., provides that failure to comply with the appellate rules may be sanctioned by refusing to consider the offending party's contentions. It is a long-standing rule of this court that we will not consider an issue which is not supported by authority or cogent argument. E. g., *Cardin v. Morrison-Knudsen*, Wyo., 603 P.2d 862 (1979); and *Peterson v. First National Bank of Lander*, Wyo., 579 P.2d 1038, 1040

(1978). An argument which is not briefed according to our rules of appellate procedure will not be considered. We, therefore, decline to consider the "probative-value" argument.

### Laches and Estoppel

In his conclusions and order, the judge of the district court said:

"That the so-called Tripartite Agreements of February 24, 1917 recorded March 28, 1917 in the Fremont County Clerk's Office in Book H of Miscellaneous, page 337 and page 339, create a perpetual preferential right in favor of the Riverton Ditch Company and the Riverton Valley Irrigation District and were validly executed."

Since we affirm the trial court's finding that the 1917 Tripartite Agreements are valid, we need not consider whether the agreements can be challenged at this late date. We also need not consider whether an equal division of the water among all three districts would injure the appellees since appellants associate this issue with the issues of *laches* or *estoppel*.

### Measuring Devices

Appellants' final argument is: "The Appellee Irrigators Diversion Systems Must Have Headgates And Measuring Devices." It is stipulated that members of Midvale have such devices while members of the appellees-districts do not. However, the division water superintendent testified at trial that the appellees-districts had headgates and measuring devices. The dispute thus seems to be whether individual members of the appellees-districts must have such devices.

The relevant statute appears to be § 41–3–613, W.S.1977. The first sentence of this statute reads:

"The owner or owners of any ditch or canal shall maintain, to the satisfaction of the division superintendent of the division in which the irrigation works are located, a substantial headgate at the point where .the water is diverted, which shall be of such construction that it can be locked and kept closed by the water commission-

er; and such owners shall construct and maintain, when required by the division superintendent, flumes or other measuring devices at such points along such ditch as may be necessary for the purpose of assisting the water commissioner in determining the amount of water that is to be diverted into said ditch from the stream, or taken from it by the various users. . . ."

Appellees-districts focus on the phrase, "a substantial headgate at the point where the water is diverted," and argue that the statute only requires a headgate where water is diverted from the stream. They argue that it does not require individual users of an irrigation project to install and maintain headgates when an allocation of water is made to the irrigation project as a whole. Appellants cite the two Wyoming cases annotated to the statute, but these cases are not relevant to the dispute in the case at Bar. Finding no contrary authority to appellees' sensible interpretation of the statute, we adopt it.

As to appellants' claim that the individual members of the appellees-districts must install measuring devices, we note that the statute only authorizes the superintendent to require this. The superintendent testified that if a dispute arose between individual users in the appellees-districts, then he could use a weir to determine how much each individual was entitled to. There is no showing that the superintendent requires individuals within the appellees-districts to have measuring devices.

Appellants also cite § 41–3–313, W.S. 1977, but that act only governs waterworks constructed after the 1977 passage of that act.

### Involvement of the United States

In its original complaint, plaintiff-Midvale named the United States as a defendant because it is now one of the owners of water rights under Permit No. 7300. At oral argument before this court, the United States did not claim any specific injury as a result of the trial court's decision but insisted that the judgment should not apply to the United States because the district court lacked subject-matter jurisdiction over the

United States. The United States had unsuccessfully presented that argument to the district court and had failed to have the case removed to federal court.

After considering the matter, we have concluded that the United States did not perfect an appeal to this court and, therefore, we need not consider the merits of the claim that the district court lacked subject-matter jurisdiction over the United States.

The United States did not file a notice of appeal. As an appellee, it may present any argument which supports the trial court's judgment, including reasons rejected by the trial court; however, an appellee who has not cross-appealed may not attack the judgment of the trial court. *Wyoming State Treasurer v. City of Casper*, Wyo., 551 P.2d 687, 693 (1976), citing *United States and Interstate Commerce Commission v. American Railway Express Company*, 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924). See, also, *Hurst v. Davis*, Wyo., 386 P.2d 943, 952 (1963). Since the United States is attacking the trial court's judgment (insofar as it applies to the United States) without having filed an appeal, it is not properly before us.

The judgment of the district court is affirmed.