**MOBERLY ASPHALT MAINTENANCE, INC., a Wyoming Corporation, Appellant (Plaintiff),**

v.

**ROYAL ASSOCIATES, LTD., a Wyoming partnership; Royal Plaza, Inc., a Colorado Corporation; Royal Associates, Inc., a Wyoming Corporation; and Titan Enterprises, Inc., a Wyoming Corporation, Appellees (Defendants).**

No. 5306.

Supreme Court of Wyoming.

Oct. 31, 1980.

John Burk, P. C., Casper, for appellant.

W. Michael Kleppinger, of Crowell & Chapin, P. C., Casper, for appellees.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

ROSE, Justice.

This is a multi–issue appeal from the judgment of the trial court which found that a residential developer was justified in refusing to pay most of the balance due a subcontractor on two contracts for the reason that the subcontractor's work was deficient. We will affirm on the ground that the record supports the trial court's various factual findings. This resolution makes unnecessary a consideration of many of the challenges to the court's legal conclusions.

Moberly Asphalt Maintenance, Inc., plaintiff–appellant, is a paving contractor. The defendant–appellee, Royal Associates, Ltd., is a partnership composed of three corporations operating as a residential subdivision developer. In July of 1976, the parties entered into a contract under which Moberly agreed to pave most of the streets of Pratt Addition No. 1 to the City of Casper, which Royal was developing. A second contract entered into the same month called for Moberly to also install curbs, gutters and sidewalks. Both agreements provided for the work to be done according to city specifications. The contract price contemplated by these two agreements, as later modified, was $172,298.20. Prior to this litigation, Royal had paid $65,000.00 to Moberly and

offered an additional $9,585.61 in lieu of the balance. It was Royal's position that it had been required to pay $97,712.59 to other contractors to bring Moberly's work up to city specifications and to satisfy liens incurred by Moberly, and, thus, Royal was not obligated to pay Moberly the full balance contemplated by the contracts.

The trial court allowed Royal its claimed deduction of $97,712.59 and ordered an additional $9,585.61 payment to Moberly, a sum which Royal acknowledged was due and owing.

Most of the offset claimed by Royal involved money it spent repairing and upgrading Moberly's paving work. In this regard, it is undisputed that Moberly encountered various problems with the city engineer, who eventually ordered Moberly off the paving job. The major issue in this case is whether Moberly or Royal is responsible for the failure of the paving. Parenthetically, it should be noted that $5,464.47 of the offset claimed by Royal involved money it paid subsequent contractors to bring the curb, gutter and sidewalk up to city specifications. There is a factual dispute as to whether problems with this concrete work were caused by the manner in which the work was performed or whether they developed after completion and were caused by Royal's trucks driving over the finished concrete work.

At trial, Moberly sought not only the balance due under the contract but almost $400,000.00 in addition, alleging that it was entitled to punitive damages, recovery in quantum meruit, damages for impairment to its business and damages for Royal's refusal to enter into a second paving contract with Moberly.

Moberly has framed ten issues, three of which we will consider together. These are:

"I. WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN FINDING MOBERLY RESPONSIBLE FOR THE SUBGRADE PREPARATION

"II. WHETHER THE TRIAL COURT'S FINDING IN REGARD TO ADEQUATE SUBGRADE PREPARATION IS CLEARLY ERRONEOUS AND CONTRARY TO THE GREAT WEIGHT OF THE EVIDENCE

"III. WHETHER THE TRIAL COURT'S FINDING WITH REGARD TO THE PROXIMATE CAUSE OF THE STREET FAILURE IS CLEARLY ERRONEOUS AND CONTRARY TO THE GREAT WEIGHT OF EVIDENCE"

The street contract incorporates by reference a letter from the Casper city engineer, setting out various paving requirements for city streets. This communication contains cross-section diagrams of a paved street, which show that a street consists of asphalt layers and coatings, gravel and a subgrade. The subgrade is the underlying dirt, or "native inplace material;" the gravel consists of a layer referred to as a "gravel base course;" and there may also be a lower gravel layer called a "gravel subbase course." Two asphalt layers, each with its own coating, finish the street. To facilitate water drainage, the street is crowned so that it is highest in the center. From the diagram, it appears that the asphalt and gravel layers have a uniform thickness, so it is the contour of the subgrade that determines the contour of the street.

At trial, it was Moberly's position that subgrade preparation was the responsibility of Royal or its other subcontractors and the street failures were the result of the subgrade being inadequately compacted prior to paving. The court found, however, that the subgrade, contrary to Moberly's contentions was not the cause of pavement failure. The evidence is sufficient to support this finding.

The water, sanitary sewer and storm sewer lines were laid in the center of the streets, and Moberly urges that when these trenches were backfilled, the dirt was not properly compacted. Moberly further argues that the deficient methods used to compact the dirt in these trenches made the

defective compaction latent rather than patent in nature.

In support of these contentions, Moberly's expert testified that insufficient compaction of the soil creates a space where water accumulates, freezes in cold weather and, upon expansion, uplifts, breaks up, and causes surface distortion. The witness went on to say that proper compaction of the soil requires a certain optimum moisture content. He explained that too much moisture produces mud which defies compression, while too little moisture deprives the soil of lubrication needed for compaction. The expert witness expressed the opinion that the compaction methods used on the subgrade—and in particular the utility trenches—were inadequate.

Moberly sought additional damages for expenses incurred in removing excess dirt from the subgrade on the theory that the dirt removal was not contemplated by the parties in their contract.

Royal's first witness was David Korenke, assistant Casper city engineer. Korenke testified that the city required compaction tests of the subgrade and that paving would not be accepted where compaction–test results were not satisfactory. The witness also testified that the city complained to Moberly about the streets lacking a crown when Moberly was preparing to pave. According to Korenke, Moberly first indicated that the crown would be established before the first layer of asphalt. When the first layer of asphalt was in place and there was no crown, Moberly, according to Korenke, promised to structure the crown when applying the second layer of asphalt. The witness further testified that Moberly did not incorporate such a crown in the finished street, as was called for by the city specifications. Korenke further testified that the city refused to allow Moberly to use some materials because they were of poor quality.

It was shown, through photographic exhibits, that portions of the paving were deficient and substandard. These exhibits portray a "lay down machine" applying the second layer of asphalt, and it appears that the first layer of asphalt on which the machine rests is seriously deficient by virtue of its being cracked or containing holes. Yet another exhibit portrays a large gouge mark in the first layer of asphalt, which appears to have been caused by a paving machine becoming stuck. Korenke testified that he complained of these and other inadequacies to Moberly but finally came to disbelieve assurances that various defects would be corrected before Moberly applied the final layer of asphalt.

Introduced into evidence was a letter from Royal to the city acknowledging the city's dissatisfaction with Moberly's efforts, and in which Royal promised to have tests performed to determine what work needed redoing and then to redo it if necessary. Royal introduced a February, 1977, letter from Casper City Engineer Gary S. Carver to Royal, which summarizes the city's interpretations of the test results and the measures necessary for correction of the problem. The letter places some of the blame for the street failure on poor quality materials utilized in the paving, but admits that the city engineer's office did not evaluate the compaction of the subgrade. The letter also relates that the crown in the streets is unacceptable. The city proposed a one–inch overlay to correct structural defects, together with excavation and backfilling of any areas showing "pavement distress" by summer or by the time traffic is permitted on the streets. Korenke testified that the sense of the letter was that a one–inch overlay, together with crown corrections, would satisfy the city.

Korenke went on to relate that the Casper Concrete Company installed a one–inch overlay, and corrected the crown, after which the city accepted the street, contingent upon the receipt of a one–year warranty of fitness from Royal and its officers. None of the streets, according to Korenke, required excavation and backfilling by Casper Concrete.

Clement R. Prouhet, one of the owners of Royal, testified that the city wrote Royal noting dissatisfaction with Moberly's paving. Prouhet testified that Royal then in-

structed Moberly to quit work, and he denied Moberly's assertion that Royal had asked Moberly to get as much work done as possible before the city shut Moberly down. The witness went on to relate that, because of the city's dissatisfaction with Moberly's paving and curb, gutter and sidewalk work, the city forced Royal to give an additional one–year guarantee on that work and required certain of Royal's principal stockholders to personally guarantee the job. Prouhet said that some of the concrete work was incomplete and that much of the sidewalk was broken. The witness then demonstrated how Royal had incurred expenses of $97,712.59 to repair or correct the Moberly deficiencies or to extinguish liens incurred by Moberly.

Robert McCoskery, manager of a rival paving organization, Casper Concrete Company, testified that Moberly applied the first layer of asphalt too thinly. He related that he observed the steel–wheeled roller breaking through the first layer due to its inadequacy. He further testified that the crown was deficient and that there were soft spots in the pavement. McCoskery's firm then did the repair work and McCoskery explained his firm's bill.

Emmerett Bolton, Vice President of Casper Concrete Company, testified that he observed that Moberly did not properly prepare the subgrade and he observed that paving was commenced without a proper crown having first been fashioned. He observed Moberly paving under unacceptably wet conditions and had seen the paving machine getting stuck. He related that the asphalt that Moberly laid was not of uniform thickness.

In paragraph 4 of the Judgment, the trial court found:

"... The evidence did not establish that subgrade preparation was inadequate or that inadequate subgrade was a proximate cause of the pavement failure."

The trial judge also found:

"That Plaintiff did not complete its work under either contract in accordance with the specifications nor in a workman-

like and commercially reasonable manner. A comparison of the contract specifications in Exhibit 4 with the testing report in Exhibit 17 demonstrates numerous shortcomings in Plaintiff's work regarding subbase, base, asphalt binder, and asphalt surface courses. Plaintiff failed to place an adequate crown in the street. It was Plaintiff's duty to set and establish the crown and to accomplish whatever preliminary staking that was necessary to that end.... Paving also failed because of Plaintiff's negligence in laying asphalt when the base was too wet. Plaintiff failed to dry the base or wait until it was dry.... Concrete work done by Plaintiff also failed in certain respects and was not done in a workmanlike manner. Plaintiff did not complete its required work of raising manholes and cleanup and left liens on the project by its failure to pay suppliers...."

We think the above–reviewed facts support the trial judge's finding that the pavement failure was not the fault of the subgrade preparation. In our summary of the evidence, we do not pretend to have given equal time to both sides. Our appellate rules provide:

"... We will assume the evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may fairly be drawn from it. *Hammer v. Town of Jackson*, Wyo., 524 P.2d 884 (1974); *Mellor v. Ten Sleep Cattle Co.*, Wyo., 550 P.2d 500 (1976); *Allen v. Allen*, Wyo., 550 P.2d 1137 (1976); and *Douglas Reservoirs Water Users Ass'n v. Cross*, Wyo., 569 P.2d 1280 (1977)." *DS v. Dept. of Public Assistance and Social Services*, Wyo., 607 P.2d 911, 920 (1980).

Also, under our appellate rules,

"[w]hen there is evidence to sustain a trial court's finding, this court will not interfere with that finding unless it is clearly erroneous or so totally against the evidence as to be manifestly wrong. *Bowen v. Korell*, Wyo., 587 P.2d 653, 655

(1978)." *Clausen v. Boland*, Wyo., 601 P.2d 541, 543 (1979).

Applying these concepts, we conclude that Moberly did not follow proper procedures in laying the asphalt and that Moberly's failure to do so caused the pavement failures.

■ We have also held that if a judgment can be affirmed on any ground, it will be affirmed. *Gardner v. Walker*, Wyo., 373 P.2d 598, 600 (1962). This rule relieves the appellate court of justifying or considering each of several alternative rationales of the trial court in support of its ultimate decision. We need not consider, for example, whether Royal or Moberly was responsible for proper compaction of the subgrade as a causative factor for the pavement's failures because the trial court has found that the failures were not due to improper compaction.

Even so, with respect to the failure of Moberly to provide a proper crown, we must consider the adequacy or inadequacy of the subgrade because it has been established by the evidence that the most efficient way to achieve a crown is to properly contour the subgrade. A Royal witness testified that the finished Moberly pavement lacked a proper crown and that this lack of crown was not accompanied by pavement distress indicative of subsidence under the crown. We may accept that testimony and conclude that failure to properly compact the subgrade was not the cause of the lack of a proper crown. This suggests that the lack of a proper crown was due to improper contouring of the subgrade or gravel layers.

The pavement contract between Moberly and Royal incorporates by reference certain City of Casper specifications which include a crown. The specifications include street diagrams which show the subgrade. Moberly argues that the reference to the specifications should not be allowed to "alter" the contract by making the contract include subgrade preparation when the parties intended to include only the gravel and asphalt layers in the contract. However, we think it obvious that Royal contracted for a street that would meet Casper specifications and neither party contemplated a street that was not constructed with a proper crown. There is also testimony that a crown can be built up above the subgrade and that Moberly promised to correct crown deficiencies at later stages. The lack of a proper crown foundation in the subgrade, if a defect chargeable to Royal, was a patent defect—one obvious to Moberly—and with respect to which Moberly had a duty either of correction or notification.

The Alaska Supreme Court has held that a paving contractor has the duty to warn the owner of defects in the project which will likely cause the work to fail, if the contractor knew or reasonably should have known of the defects. *Lewis v. Anchorage Asphalt Paving Co.*, Alaska, 535 P.2d 1188 (1975), and opinion on appeal from remand, 579 P.2d 532 (1978). In view of this authority and testimony that Moberly promised to correct crown problems when installing the gravel layer, we conclude that if the subgrade was inadequately crowned when Moberly began paving, Moberly, having failed to either correct it or notify Royal of the deficiency, cannot successfully urge that fact as a defense to the inadequate crown in the finished product.[1]

We are satisfied that the trial judge correctly concluded that Moberly, and not Royal, was at fault for the pavement failure and inadequate crown.

"VI. WHETHER THE COURT, AS A MATTER OF LAW, CAN INJECT AN UNPLEADED AND UNPROVEN AFFIRMATIVE DEFENSE TO PRECLUDE RECOVERY BY MOBERLY"

■ In light of our discussion of the first three issues, it is more orderly for us to

---

1. *We realize that there is uncontradicted evidence that Moberly expressed dissatisfaction with the state of the subgrade to Royal before it began paving. However, the fact that Moberly may have complained about the subgrade and argued with Royal about which party was responsible for preparing the subgrade did not discharge Moberly from its duty to warn Royal that if it began paving work on the subgrade, the resulting street would be in violation of city specifications.

discuss appellant's sixth issue next. As mentioned, the trial judge found that Moberly did not complete its work "in a workmanlike and commercially reasonable manner," and that the paving failed because of Moberly's "negligence." Moberly objects that these defenses were not pleaded and were thus waived. The following allegation appears as appellees' fourth affirmative defense in their answer to the complaint:

"... that subsequent to the completion of work undertaken by the Plaintiff, as alleged in Plaintiff's Complaint, certain corrective and repair work was required before acceptance by the City of Casper; further, such repair and corrective work was undertaken by the Defendant upon the Plaintiff's refusal thereof; further, the Defendant has expended the sum of Ninety–Nine Thousand Two Hundred Fifteen Dollars and Twenty Cents ($99,215.20) in the repair as demanded by the City of Casper."

Moberly recognizes the principle that pleadings are to be liberally construed, *Sump v. City of Sheridan*, Wyo., 358 P.2d 637 (1961), but argues that it was deprived of advance notice of the trial issues. We find this contention implausible. The answer quoted above is sufficient to place Moberly on notice that Royal claimed and would be entitled to prove at trial that the work done by Moberly was not satisfactory and that Royal considered Moberly to blame for the deficiencies.

The following issues may be treated together:

"V. WHETHER THE TRIAL COURT'S FINDINGS WITH REGARD TO DISALLOWING DELAY DAMAGES TO MOBERLY IS CLEARLY ERRONEOUS AND CONTRARY TO THE GREAT WEIGHT OF THE EVIDENCE"

"IV. WHETHER THE TRIAL COURT ERRED AS A MATTER OF LAW IN REJECTING THE STANDARD OF DAMAGES FOR DELAY"

"VIII. WHETHER AS A MATTER OF LAW THE COURT CAN DISREGARD UNCONTROVERTED EXPERT TESTIMONY"

Moberly urges that, due to the fault of Royal, it was delayed in its work under the contract and thereby suffered $27,617.00 in damages. Specifically, it contends that it was idled while waiting for Royal to remove excess dirt from the streets. The trial court treated the claim–for–delay damage issue in this manner:

"That delays in the completion of Plaintiff's work were not the fault of Defendants but due to Plaintiff's failure to produce gravel meeting the specifications and to Plaintiff's insistence that more dirt be removed, which dirt was not excessive, except for certain areas where excessive dirt had been produced by Plaintiff in the course of its concrete work. Plaintiff did not suffer a compensable loss as a result of the delays, considering the plaintiff used the time to work on other projects and the plaintiff did not have a history of profitable operations. The computation of Plaintiff's expert of damages from delay totaling $27,617.00 is totally unreasonable."

Concerning Moberly's claim that the trial judge erred in assigning the cause of delay, Moberly has the burden of pointing to the portions of the record which prove its contentions. Rules 5.01 and 1.02, W.R.A.P., and *Dechert v. Christopulos*, Wyo., 604 P.2d 1039, 1044–1045 (1980). Moberly cites testimony of one of the Moberly brothers to the effect that Moberly had informed Royal that work couldn't go forward until excess dirt had been removed. At the bottom of that page, Moberly was asked:

"Q. What happened at that time, did you continue along with your work?"

He replied:

"A. We continued along with what we could, in fact I think we went ahead and took some material, some of the subgrade material off Kelly...."

In support of the trial judge's finding, appellees cite to testimony by Mr. Korenke,

assistant city engineer. Korenke testified that there were times when Moberly was not allowed to continue its street work because the city objected to the quality of the gravel Moberly was using. The following testimony is pertinent:

"Q. During the period of time you say that they were switching gravel pits and tests were being submitted to you was work actively continued in Pratt No. 1 or for some reason did it have to be shut down?

"A. Well, it kind of went in spurts, then we would request Mr. Moberly not to use the pit that had failed to meet the gradation requirements, then in the meantime he would try and find another pit, he could use that would meet the specifications.

"Q. And during the time in which you had asked him not to use certain aggregate and find another, would he be able to pursue his normal paving operations in Pratt No. 1?

"A. No, he didn't we didn't want him to use that material on Pratt No. 1.

\* \* \* \* \* \*

"Q. You had testified before, had you not, that some tests had been submitted to the City of aggregate and it did not pass. Is that correct?

"A. That is correct.

"Q. *And you required the contractor to find additional aggregate, right, and correct me if I am wrong, but you also testified, did you not, that during that time period where one aggregate would not pass and additional aggregate needed to be found, the paver could not continue in Pratt No. 1 on that particular aspect of the paving operation. Isn't that right?*

"A. *That is correct.*

"Q. Can you give us a time frame in terms of hours and days or weeks?

"A. Okay. Generally it would be a period of several days, and then it seems he would find a new pit and then we would be back working, he would submit a test that did pass, we would say, go ahead, and again with it, and then for one reason or another that stockpile would run out, and he would be looking for another pit.

"Q. Do you have any recollection how many times this happened?

"A. Let's see, I believe it happened at least three times.

"Q. And during those times, during those three times, would Moberly Asphalt have been working on the road in Pratt No. 1?

"A. No, he wouldn't have been." (Emphasis supplied.)

Appellant argues that a "cute" question by Royal's counsel produced an obviously erroneous answer. Moberly suggests that the "paver" in the italicized portion of the transcript reproduced above referred to a paving machine that lays asphalt, while the gravel problems had to do with gravel used in the gravel layer underneath the asphalt. Although it is conceivable that Korenke and his examiner could have abandoned their original discussion of gravel in the base course and started talking about gravel which is utilized in the asphalt mix, it would appear that the trial judge assumed that the discussion never left the topic of the adequacy of the gravel used in the base course. Therefore, it cannot be said that Moberly's gravel problems prevented the paving machine from operation for lack of approved material with which to make an asphalt layer. On the other hand, the paving equipment could have been prevented from operating because of lack of prepared gravel courses upon which to lay asphalt. This is what the judge must have concluded, and there was sufficient evidence to support this resolution. Moreover, it is established elsewhere in the evidence that Moberly was unable to work on the streets in the subdivision for lack of approved gravel.

Thus, even without resort to appellees' "cute" question, there was sufficient evidence upon which the trial judge could base his conclusion that Moberly's problems in obtaining adequate gravel for the base course was a cause of delay in Moberly's work.

Having carefully considered appellant's criticism of the evidence which appellees rely on to support the trial judge's conclusion and having considered the single citation to the record offered by appellant in support of its contention that the delay complained of was caused by excess dirt in the roadway, we are not persuaded that appellant has met its burden of challenging the sufficiency of the evidence in support of the trial judge's finding.

Since we are not convinced that Moberly's delay was caused by Royal, it becomes unnecessary for us to address the issues of how delay damages are to be calculated or proved.

"VII. WHETHER THE TRIAL COURT'S FINDING THAT MOBERLY DID NOT COMPLETE THE CONCRETE CONTRACT WAS CLEARLY ERRONEOUS AND CONTRARY TO THE GREAT WEIGHT OF EVIDENCE"

■ Moberly attacks the trial court's finding in the judgment, which holds that the plaintiff did not complete its concrete work in a workmanlike and commercially reasonable manner and that the concrete work done by the plaintiff had failed.

It is undisputed that, for whatever reason, it became necessary to repair the concrete work. It is Moberly's contention that such repairs were necessitated by Royal's trucks driving over them, and the appellant goes on to argue that there is a lack of proof that curb, gutter and sidewalk repairs were necessitated by deficient workmanship.

One of the Royal owners, Prouhet, described a letter from Casper Engineer Carver to Royal, complaining of curb, gutter and sidewalk deficiencies. The communication listed a number of sections that were broken or in need of cleaning, as well as sections that would have to be replaced because the "flow line" was too low, causing large pockets of water to collect on both sides of the street. Prouhet then related that it became necessary to hire another subcontractor to make the necessary

repairs, and Moberly does not claim that it should have been given further opportunity to correct these problems.

The curb, sidewalk and gutter contract provides that the work will be done to city specifications. The letter from the city engineer established, in fact, that Moberly had not completely performed its part of the contract. We, therefore, need not search for proof of unworkmanlike conduct by Moberly or its subcontractor; proof of Moberly's incomplete performance under the contract entitled Royal to a deduction from the contract price.

The evidence upon which Moberly relies to prove that the failure of the concrete work to completely meet city specifications was Royal's fault is meager, indeed. Moberly merely states in its brief that "[t]here was evidence that the building contractor's trucks and suppliers were driving over the sidewalks." Such evidence, even if present in the record and fully credited by the trial judge, does not establish that the flowline problems or the breaks in the curb, gutter and sidewalk were caused by abuse for which Royal is responsible.

The evidence of record convinces this court that Moberly did not completely satisfy its contract, and the evidence did not compel the trial judge to blame this lack of performance on Royal. Although our rationale for affirming the trial judge's decision which allowed Royal a set-off of some $5,465.47 for Royal's cost of repairing the concrete work is not identical to the trial judge's, *Gardner*, supra, dictates that we affirm the judgment on any reasonable ground appearing in the record.

"IX. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN REFUSING TO ADMIT AN IMPEACHMENT EXHIBIT BECAUSE THE EXHIBIT WAS NOT A NOTICED EXHIBIT IN ACCORDANCE WITH RULE 16, WYOMING RULES OF CIVIL PROCEDURE"

The offered and refused exhibit concerned the issue of whether Royal had

knowledge of alleged latent defect in the subgrade. Since we uphold the trial judge's finding that the subgrade did not contribute to the pavement failure, we need not consider this issue.

"X. WHETHER THE TRIAL COURT'S FINDING THAT MOBERLY'S BUSINESS WAS NOT IMPAIRED BY ROYAL'S FAILURE TO PAY THE SUMS DUE WAS CLEARLY ERRONEOUS AND CONTRARY TO THE GREAT WEIGHT OF THE EVIDENCE"

At trial, Moberly contended that Royal's wrongful failure to pay Moberly under the contract damaged Moberly's business. Royal had previously offered to pay Moberly the $9,585.61 which the trial court determined was the full extent of Moberly's claim. Since we uphold the trial judge's determination that this was all that was due Moberly, it follows that Royal did not wrongfully refuse to pay Moberly.

The judgment of the trial court is affirmed.