Terry M. ZANETTI, Appellant
(Defendant),

v.

Pete ZANETTI, Donna J. Zanetti, James
F. Zelenka, Peter A. Zanetti, a/k/a Pete
A. Zanetti, Jr., and Edwin V. Magagna,
Appellees (Plaintiffs),

William M. Zanetti, Appellee
(Defendant).

No. 83–170.

Supreme Court of Wyoming.

Oct. 29, 1984.
Rehearing Denied Dec. 5, 1984.

Joe R. Wilmetti, Casper, for appellant (defendant).

John W. James of James & James, Rock Springs, for appellees (plaintiffs).

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

ROSE, Justice.

### Nature of the Action

Plaintiffs-appellees—the elder Pete Zanetti, his second wife, Donna, and Peter A. Zanetti, Jr., together with James F. Zelenka and Edwin Magagna—sued Pete Senior's sons, Terry and William Zanetti, for alleged breach of an oral agreement to sell their interests in a joint venture, in which action they sought specific performance, damages and partitioning of certain joint-venture property.[1] Peter A. Zanetti, in

---

1. Sometimes referred to here as the "Purple Sage" properties.

turn, sought affirmative relief from his father on another alleged contract for the purchase of his (Peter's) interest in the joint venture. Pete Senior denied that he was obligated to his son Peter upon any enforceable contract to purchase his son's interest in the venture.

Terry and William denied liability under any agreement with their father on the ground that he, as manager and overseer of the joint-venture properties, was attempting to defraud and cheat them and it was for this reason that they refused to go through with an agreement to sell their interests in the joint venture.

In addition to the above disputes, the contractor and the engineer who had been hired to aid in the development of the joint-venture property filed separate suits for their expenses and services. In all, three actions were filed and consolidated for trial and appeal.

## FACTS

In 1974, Pete Zanetti, father of Terry, William and Peter A. Zanetti, acquired a one-half section of land in Sweetwater County with a view to a quick resale to Texasgulf, Inc. So that his friends Magagna, Zelenka and G. Gordon James, a trailer-sales business person, could share in the venture, Pete invited them and his sons to participate—and they all accepted and entered into a written joint-venture agreement. The initial capital investment of each of the adventurers was $6,400, of which Pete loaned son Peter $5,924.81 and son William $4,669.43. The relevant provisions of the agreement provide:

"WHEREAS, PETE ZANETTI, has heretofore entered into an Agreement with the ROCK SPRINGS GRAZING ASSOCIATION, a Wyoming Corporation, for the purchase of:

"The South Half (S ½) of Section Eleven (11), Township Eighteen (18) North, Range One Hundred Six (106) West of the Sixth (6th) Principal Meridian, Sweetwater County, Wyoming;

"AND, WHEREAS, PETE ZANETTI, has heretofore advanced funds which have been applied upon the purchased price, upon the cost of surveys, the cost of interest upon balances due or funds borrowed for said purposes and will hereafter be obligated to additional funds for the same purposes;

"AND, WHEREAS, it was and is the intent of the parties hereto that the purchase of said land, the improvement, development and sale thereof be a joint venture of PETE ZANETTI and the undersigned, PETE A. ZANETTI, JR., TERRY M. ZANETTI, WILLIAM M. ZANETTI, JAMES F. ZELENKA, G. GORDON JAMES and EDWIN V. MAGAGNA, upon the following terms and conditions:

"1. The title to said property until sold or otherwise disposed of shall remain in the name of Pete Zanetti.

"2. Advances heretofore made or hereinafter made or obligated to be made, up to but not to exceed the total sum of $196,000.00 shall be computed as capital investment by Pete Zanetti and the undersigned.

"3. Any advances by PETE ZANETTI, or by any one of the undersigned in excess of one-seventh (⅐th) of the capital investment, or in excess of $28,000.00 shall be computed as loans, to be repaid to the person making said loan from funds of said joint venture, together with interest at the highest current rate being charged by the North Side State Bank to Pete Zanetti, individually or to any one of his bus corporations.

"4. Any gain or loss resulting from said joint venture shall be shared one-seventh (⅐th) by Pete Zanetti and each of the undersigned.

"5. Pete Zanetti and each of the undersigned shall be obligated to furnish up to one-seventh (⅐th) of the various amounts that may be required from time to time.

"6. Funds received from any source shall be applied as follows:

"(a) In payment of amounts due to third parties;

"(b) In payment of loans of Pete Zanetti and the undersigned;

"(c) On a pro-rata basis of one-seventh (1/7th) each to Pete Zanetti and the undersigned."

The sale to Texasgulf did not materialize, but Pete settled this sales agreement on a basis that was beneficial to the venture in that the settlement figure was nearly sufficient to pay the remaining balance due on the Purple Sage property. When Texasgulf refused to go through with the purchase of the Purple Sage property, Pete, who all adventurers agreed would be the managing partner, had trouble disposing of the property, mostly because of the unavailability of water. In an effort to improve its saleability, Pete undertook to drill water wells on an adjoining piece of land owned by Pete Zanetti. The brothers at first objected to contributing to the costs of the water wells because they were not drilled on the venture's property and for the further reason that the costs were too high, but the record discloses that they ultimately paid their share of these costs. The brothers admonished their father not to drill more wells, but he did it anyway and some of the wells produced water.

In behalf of his further efforts to subdivide and sell the property, Pete Zanetti contracted for substantial development and engineering work. However, he first bought out G. Gordon James, whose interest had been divided by transferring one-half to Herman Franks. Pete paid for the James interest out of venture funds, and the Franks interest from his personal moneys, with the entire interest being held by him personally. The evidence revealed that it was necessary to acquire the James and Franks interests before development financing would be made available.

After a meeting with the other members of the venture and in pursuit of his development plans, it was Pete Senior's understanding that he had an oral commitment from all of them that they would sell their various interests in the venture to him. The elder Zanetti offered to buy out the remaining interest holders by paying into the venture $3,500 per acre for 136 acres, with an option to pay $7,000 per acre for the remaining 173 acres—a price substantially in excess of the amount that each had contributed to the enterprise.

With the understanding that he had an agreement to acquire all of the outstanding venture interests, Pete went ahead with the development project, and in the course of doing this, he incurred substantial expense. When the brothers learned about this development activity, they were reluctant to sell—particularly was this so in the case of Terry Zanetti, who had bought from and paid the venture for 11 acres but had not received a deed for the property. Terry was also critical of the fact that the venture had bought and paid for the interest of G. Gordon James with venture funds, while Pete Senior retained title to this interest with the announced intention of conveying it to his second wife, stepmother of the Zanetti sons.

Because of these difficulties, the interest owners met a second time, and Pete presented a revised contract for purchase. At this meeting, Terry was presented a deed to the 11 acres which were in controversy and Pete offered to purchase 136 acres for $3,500 per acre with the remaining 173 acres to remain the property of the venture.

The testimony reveals that William and Terry were still not satisfied. They learned that the elder Zanetti was proceeding with the development in his name and not in the name of the venture—they believed that their father was misleading them as to the cost and potential profits of the project and that he had an opportunity to sell the property to Comfort Housing at a price which was not being disclosed to the other participants. In his Findings of Facts and Conclusions of Law, the trial judge summed up the position of the appellant in this manner:

"The clear implication of the testimony was that the two (2) sons believed Pete Zanetti was attempting to defraud or cheat them out of a large profit."

Pete represented to his sons during the buy-and-sell negotiations and at the trial that he never had any legitimate offer of sale from Comfort Housing or any other potential purchaser at any time prior to the trial of this case. In consequence of all this, no sale of the adventurers' interest was consummated with the senior Zanetti who by then had paid out $666,424 for the development of the Purple Sage properties. Pete therefore caused the work on the project to come to a stop and commenced the action that brings on this appeal.

### The Trial Court's Holding

The court held generally in favor of the appellees and against the appellant in that it

1. partitioned the adventure property;

2. recognized and ordered enforced the terms of the joint-venture agreement;

3. found that there was no enforceable contract requiring Pete Senior to purchase the separate interest of his son Peter A. Zanetti in the venture;

4. held that the elder Zanetti was not guilty of fraud or mismanagement;

5. found against the contention of the elder Zanetti to the effect that there was an enforceable contract for the sale of the adventurers' interest in the venture to him; and

6. ordered that payment of liabilities and distribution be made under the terms of the venture agreement. Further, the court ordered that water-well, road and all other costs and financial obligations be assigned as liabilities of the joint venture only to the extent that they were actually incurred in the venture's behalf and that Pete Senior pay all other costs and expenses incurred and claimed which were not assignable to the benefit of the venture.

7. Lastly, the court held that, should there be sufficient proceeds from the sale of the property, they should be applied as follows:

(a) to the reimbursement of Pete Senior for advancement in the management and development of the property in the sum of $408,931 plus interest;

(b) the remaining balance, if any, to the six remaining adventurers in equal amounts.

### Alleged Error

The appellant identifies several issues which may be described and abbreviated as follows. He states that the trial judge committed error in overemphasizing the father-son relationship—committed error in disregarding the testimony of a witness named Cliff McCallum; in admitting certain bankruptcy testimony; in failing to make disposition of bankruptcy funds on hand; "in failing to place any conditions on plaintiff's recovery"; that additional error was committed in denying appellant's claim for damages for fraud and mismanagement; in failing to take enhanced value into account; and, finally, that the court erred in finding that the record contained sufficient evidence to support the judgment.

### The Decision
#### Underlying Appellate Concepts

■ We will apply the usual pertinent appellate rules to the decision-making here; that is, we must assume that evidence in favor of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may reasonably and fairly be drawn from it. *Craver v. Craver*, Wyo., 601 P.2d 999, 1001 (1979), citing *Jelly v. Dabney*, Wyo., 581 P.2d 622, 624 (1978); *Zitterkopf v. Roussalis*, Wyo., 546 P.2d 436, 437 (1976); *Tavares v. Horstman*, Wyo., 542 P.2d 1275, 1277 (1975). We have said that:

" * * * [E]very favorable inference is to be given to the successful party. Upon appeal this court is required to resolve all conflicts in the evidence in favor of the successful party." *Barnette v. Doyle*, Wyo., 622 P.2d 1349, 1355 (1981).

In December of 1983, we reemphasized these often-cited concepts as follows:

" ' * * * [W]e must assume the evidence in favor of the prevailing party as true and leave out of consideration the evidence in conflict therewith, giving to the evidence in favor of the prevailing party every favorable inference which may be reasonably and fairly drawn from it; and we are not to evaluate the evidence, rather we are to determine only if there was substantial evidence upon which the jury could arrive at its decision if it believed the evidence in favor of the prevailing party.' " *Oberson v. Shreeve*, Wyo., 672 P.2d 1294, 1295 (1983), quoting from *Brittain v. Booth*, Wyo., 601 P.2d 532, 535 (1979) and citing: *Potts v. Brown*, Wyo., 452 P.2d 975 (1969); *Ford Motor Company v. Arguello*, Wyo., 382 P.2d 886 (1963); *Brasel and Sims Construction Co. v. Neuman Transit Co.*, Wyo., 378 P.2d 501 (1963); *Fisher v. Robbins*, 78 Wyo. 50, 319 P.2d 116 (1957).

We have also held that the judgment must be affirmed and the findings not interfered with unless it is clearly erroneous or so totally against the evidence as to be manifestly wrong. *Clausen v. Boland*, Wyo., 601 P.2d 541, 543 (1979), citing *Bowen v. Korell*, Wyo., 587 P.2d 653, 655 (1978).

▮ Concerning the trial court's findings of fact, we reiterate the rule which holds that a finding carries with it every finding of fact that can be reasonably and fairly drawn from the evidence. *Meeker v. Lanham*, Wyo., 604 P.2d 556 (1979), citing *True v. Hi-Plains Elevator Machinery, Inc.*, Wyo., 577 P.2d 991 (1978). Where, as here, the appeal comes to this court with a trial judge's findings of fact, "they must be construed liberally and favorably to the judgment." *Madrid v. Norton*, Wyo., 596 P.2d 1108, 1117 (1979). We went on to say in *Madrid v. Norton*, supra, (a joint-venture appeal):

" * * * We presume that they [the court's findings of fact] are right and where the findings of the trial court are not inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence, they will not be disturbed on appeal. *Diamond Management Corp. v. Empire Gas Corp.*, 594 P.2d 964 (1979); *LeBar v. Haynie*, Wyo. 1976, 552 P.2d 1107, 1110." 596 P.2d at 1117.

In *True v. Hi-Plains Elevator Machinery, Inc.*, supra, 577 P.2d at 996, we said:

" * * * Unless the findings of the trial court are clearly erroneous or contrary to the great weight of evidence, they will not be disturbed on appeal. *Wyoming National Bank of Casper & First National Bank of Casper v. Security Bank & Trust Co.*, Wyo.1977, 572 P.2d 1120; *Willis v. Asbury Transportation Co.*, Wyo.1963, 386 P.2d 934, 937. We cannot properly substitute our judgment for that of the trial court on findings of fact. *Zullig v. Zullig*, Wyo.1972, 502 P.2d 198."

Since the issues here have to do with credibility of the witnesses and the sufficiency of the evidence where the facts conflict, another of our observations in *Madrid v. Norton*, supra, is worthy of recall. There we noted the trial judge's superior vantage point where the observation of the witnesses is concerned, and we said:

" * * * Moreover, the trial judge was present and observed at first hand the demeanor and expressions of the witnesses. We must not forget that when we examine the cold words of the transcript of testimony, we do not have the benefit of how the trial judge sees and hears the witness—the pitch of the voice, facial changes, the movement in the witness—all of which may tell a separate story, to be given credence. The conclusion of what preponderates is with the trier of fact. *Koch v. Brown*, Wyo.1965, 401 P.2d 459. [Footnote.]" 596 P.2d at 1117.

In the footnote reference from the above quote, we said:

"As said in *Bogle v. Paulson*, 1949, 185 Or. 211, 201 P.2d 733:

" ' * * * Many times the countenance of the witness and the tale it tells are a more reliable index to the truth than the witness's tongue. The tongue is

subject to the witness's studied volition, but his manner, his gestures, his passions and the tone of his voice may be unwitting. A meditated, carefully thought-out answer, even though it dovetails perfectly with the rest of the witness's testimony, may be less convincing than testimony given readily and without delay by another whose answers do not always accord.'"

### Disregard of Rule 5.01(4), W.R.A.P. Requirements

■ In this case, the appellant raises one issue after another either without citing any authority or without citing relevant authority. For example: appellant urges "error in *disregarding* testimony of witness Cliff McCallum" (emphasis added), contending that the judge abused his discretion. In the first place, the Findings of Facts and Conclusions of Law reveal that the testimony was *not* disregarded. It was taken into account by the court, but the credibility of this witness' testimony was found suspect [2] when the court said:

"The Court finds and concludes that the testimony of Mr. McCallum is implausible and incredible in many respects."

In any case, this point in the appellant's brief contains no authority whatever in its support. It is true that the brief cites authority for the proposition that all parties to a joint venture are treated the same as in a partnership—and there is no dispute about that [3]—this authority does not, however, address the claimed error to the effect that the court overemphasized the father-son relationship and it is, therefore, as though the point contained no citation of authority at all.

The appellant urges error in the admission of testimony concerning one of the

witness' businesses which was in Chapter 11 bankruptcy, and cites no authority to support this allegation of error. The same is true of the alleged error in the court's failure to make disposition of joint-venture funds on hand. To go on, the appellant complains of

"Error in failing to place any conditions upon plaintiff's recovery,"

and not a single legal authority is cited in support of this alleged error.

Rule 5.01(4), W.R.A.P., "Brief of the Appellant," provides:

"The brief of the appellant shall contain under appropriate headings and in the order here indicated:

\* \* \* \* \* \*

"(4) An argument. The argument may be preceded by a summary. The argument shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, *with citations to the authorities,* statutes and parts of the record relied on; \* \* \*." (Emphasis added.)

Concerning the requirements contained in Rule 5.01(4), and particularly the "citations to the authorities" provision thereof, we have said:

"The purpose of our appellate rules concerning briefs is to help focus the facts, issues and authorities." *Strang Telecasting, Inc. v. Ernst,* Wyo., 610 P.2d 1011, 1015 (1980),

and we have made mention of our refusal in *Dechert v. Christopulos,* Wyo., 604 P.2d 1039, 1044 (1980) to consider the appellant's argument unsupported by a factual discussion as required by Rule 5.01(3), W.R.A.P.

In *Knadler v. Adams,* Wyo., 661 P.2d 1052, 1054 (1983), we said:

"\* \* \* Nor is there any disagreement that joint adventures, commonly referred to as joint ventures, are governed by the law of partnership. *True v. Hi-Plains Elevator Machinery, Inc.,* Wyo.1978, 577 P.2d 991, 996. The principal distinction between a joint venture and a partnership is that a joint venture usually relates to a single transaction. *P and M Cattle Co. v. Holler,* Wyo.1977, 559 P.2d 1019, 1021."

---

**2.** We said in *Madrid v. Norton,* supra, 596 P.2d at 1117:

"\* \* \* Credibility of witnesses is for the trial court. *Hench v. Robinson,* 1955, 75 Wyo. 1, 291 P.2d 417; *Eblen v. Eblen,* 1951, 68 Wyo. 353, 234 P.2d 434."

**3.** We said in *Madrid v. Norton,* supra, 596 P.2d at 1118:

"We will not consider issues which are not supported by proper citation of authority and cogent argument or which are not clearly defined." Citing *Young v. Hawks,* Wyo., 624 P.2d 235 (1981); *Elder v. Jones,* Wyo., 608 P.2d 654 (1980); and Rule 5.01(2), W.R.A.P.

■ Therefore, under the settled authority of this court, we will not consider these points which have not been briefed or where no authority is cited or where the authority which is cited does not constitute a cogent argument for the proposition for which the appellant contends.

### Fraud and Mismanagement

As the court has noted supra, the appellant charges his father with fraud and mismanagement. This is the underlying cause of action—fraud—and it is a resolution of this appeal. Specifically, Terry Zanetti charges error in not finding that his father was guilty of fraud and mismanagement in that the:

"(1) Said plaintiff commingled joint venture funds with his own personal funds.

"(2) Said plaintiff commenced a development in his own name, not in the name of the joint venture and as sole owner.

"(3) Said plaintiff expended his personal money and conducted the development activities after being informed by *all* members of the joint venture that they wanted no part of any development.

"(4) Said plaintiff failed to inform the members of the joint venture of his activities.

"(5) Said plaintiff accumulated a list of prospective buyers for lots in the development he was working on.

"(6) Said plaintiff drilled a water well on adjoining land belonging to said plaintiff personally but assessed each member of the joint venture one-sixth of the cost thereof.

"(7) Said plaintiff 'bought out' the ⅙th share of G. Gordon James with joint venture moneys and then conveyed that ⅙th share to his wife, Donna Zanetti.

"(8) Said plaintiff, when he found he could not buy defendants' shares of the joint venture upon his own terms, stopped all further development.

"(9) Said plaintiff expended the large part of the 'development' costs to construct a roadway from the highway access across his own lands (other than joint venture lands) and lands of third parties to which he had no easement or rights-of-way."

The trial court said the following about these fraudulent-mismanagement contentions in its Findings of Facts and Conclusions of Law:

"Finally, Defendants contend that Pete Zanetti mismanaged the joint venture property and accounts. While Pete Zanetti commingled joint venture funds with his own, followed imperfect accounting procedures and in general, was by no means the model upon which to base a management school curriculum, nevertheless, the Court finds and concludes that Mr. Zanetti did not fraudulently, intentionally or negligently mismanage the property. The evidence is to the contrary. The Court carefully observed the demeanor of the parties and from the totality of the circumstances, concludes that Pete Zanetti was acting in good faith. Among other things, Pete Zanetti effectively purchased the property from the Rock Springs Grazing Association, made a deal with Texasgulf, Inc. for resale at a handsome profit and upon the default of Texasgulf, Inc. successfully negotiated a very beneficial settlement without the necessity of protracted litigation. The Court finds and concludes that Pete Zanetti was effectively and efficiently proceeding with the development of the property and that he would have resolved all remaining problems, including, among other things, those involving easements and rights-of-way, had the dispute with his sons not developed.

"The Court finds and concludes there is no evidence to indicate that any of the moneys received by the joint venture or paid to the joint venture by its members were fraudulently misappropriated by Pete Zanetti. Kevin Heybourne, who

performed the audit of the books and accounts of the joint venture, testified that in his opinion the audit was correct and complete and that all the money that went into the joint venture has been accounted for and not misappropriated by Pete Zanetti. The Court accepts the testimony of Mr. Heybourne and concludes that the claim of Defendants founded on mismanagement should be denied."

### The Law of Fraud (Generally)

 We have said that fraudulent conduct implies an act which is obnoxious to good morals, *Otte v. State*, Wyo., 563 P.2d 1361, 1364 (1977), and that the basic elements of an action for fraud are false representations by the alleged defrauding party of material facts and reliance thereon to the detriment of the party asserting fraud, *Davis v. Schiess*, Wyo., 417 P.2d 19, 21 (1966). Fraud will never be presumed and will only be sustained upon evidence that is clear and convincing, *State Farm Mutual Auto Ins. Co. v. Petsch*, 261 F.2d 331, 334 (10th Cir.1958), and fraud will never be imputed to a party where the facts and circumstances out of which it is supposed to arise are equally consistent with honesty and purity of intention because fraud must be demonstrated in a clear and convincing manner. *Johnson v. Soulis*, Wyo., 542 P.2d 867, 874 (1975).

 Within the confines of our appellate authority, the only evidence concerning fraud and mismanagement which this court may consider is that which is favorable to the appellees. We summarize this evidence from the record and from the trial court's findings of fact and conclude that the trial court's decision that there was no fraud or mismanagement upon the part of Pete is amply supported by the record.

Pete Zanetti, Sr. acquired the property in question and, in good faith, and mostly out of the goodness of his heart, brought his sons and friends into a joint venture which, at the time, looked as though it promised a quick profit for all involved. A joint-venture agreement was entered into, but, through no fault of Pete Senior, the sale to a committed purchaser fell through. He then settled the buy-and-sell agreement favorably to all adventurers, thus greatly enhancing the value of each partner's share in the venture without further contribution from them. Even so, once the settlement was made and most of the debt for the purchase of the property had been repaid, the raw land could not be sold, and so Pete Zanetti, Sr. undertook to develop water, roads and other facilities so that it could be disposed of. When some of the partners objected to the increased costs that would be involved in the development and thus the necessity for additional adventurer contribution, he offered to buy the interests of the remaining adventurers for what would have been a substantial profit for all of them, and he was firmly of the opinion that he had an agreement to purchase all of the adventurers' interest and therefore proceeded with the development.

In the course of the development, believing he was to be the sole owner of all involved interests, Pete Senior drilled water wells with venture money. One was on Pete's property that adjoined the Purple Sage land, and the trial court found that this was not done in bad faith. Instead, it was done in an effort to establish the existence of water in the area. Roads were built and easements acquired with venture money. Some of the roadway development traversed property other than venture property, but the trial court found the road development was necessary to the development of the partnership property and no bad faith was involved in this road-building effort. Pete purchased one of the adventurers' interest with his own money, retaining it in his own name, but we surmise that the trial judge excused this for the reason that Pete believed that he had an agreement to buy out the others. Under the evidence, the trial judge was entitled to find that he had made two separate good-faith offers to purchase the interests of his coadventurers, and the evidence is to the effect that he believed he had an oral agreement with all of them that he would buy and they would sell all remaining inter-

ests. This agreement was not fulfilled because of the refusal of the brothers to carry out their end of the bargain. And, we can presume that the trial judge looked at the totality of the evidence and concluded that overall, even though there were indiscretions on the part of all parties, they did not, in this instance, amount to fraud, bad faith or mismanagement on the part of Pete Zanetti, Sr.

■ Then there were allegations about commingling of funds and failure to report profitable offers of sale to the adventurers. In this respect, the trial court looked to the testimony of the accountant, found his testimony credible, and accepted it. The accountant stated that there was no mismanagement or misappropriation of the funds of the venture and that even though Pete Senior had commingled funds of the adventurers with his own, his accounting and bookkeeping, although far from ideally efficient, represented no intent to defraud or misappropriate the funds of the venture.

■ As to the failure to report profitable offers of sale, the trial court did not find the offer in question to be bona fide, did not believe the witness who was supposed to have made the offer, and found that even if the alleged representation of the witness with respect to the purported offer was taken at face value, it could not be regarded as constituting a legitimate offer and thus Pete was not hiding offers of profit from the adventurers because there had been no legitimate profitable offer of purchase made to him.

In any case, the trial judge found that the venture was risky from the beginning; that in good faith Pete brought his associates in with minimum investments; that he, Pete, extended his own credit, loaned some of the adventurers money to pay their share and made shrewd deals to protect the venture property and the interests of the adventurers. The trial judge found that the property had to be developed in order to dispose of it and that Pete was willing to pay all of the associates a substantial profit for their interests since some of them could not afford to contribute their share of the additional cost of development. The trial judge further found that these were good-faith efforts to bring his co-adventurers out with substantial profits while Pete undertook the entire risk of payment of old and new development obligations.

At the time when the brothers refused to sell their interests to Pete and he was forced to cease development and bring suit, the trial judge found that

> "Pete Zanetti was effectively and efficiently proceeding with the development of the property and that he would have resolved all remaining problems * * *." Findings of Facts and Conclusions of Law.

■ The trial judge wisely distributed the debts and profits, if any, equitably. He held all participants to the venture agreement and disregarded all other alleged agreements as too nebulous, tentative, indefinite and thus unenforceable. The trial judge directed, in short, that the application of all funds on partition be assigned to debts attributable to the benefit of the venture; that Pete pay all other debts which he had incurred; and that profits, if any, be distributed equally among all the joint adventurers. This was what the adventurers themselves deemed to be an equitable solution because this is the way they all wrote the contract when they cared for one another and tensions were not bowstring tight. In addition, the trial judge directed Pete to return the G. Gordon James interest to the venture, there to be distributed equally among the partners, with Pete to receive credit for the amount paid James for the interest but that he would assume the expense of clearing the title to the Franks interest since the trial judge found this to be unreasonable under the circumstances.

It is urged that the trial court committed "error in allowing recovery without having found amount of enhanced value." In this case, it was stipulated that the property should be partitioned and sold under the provisions of the applicable Wyoming statutes since the parties could not agree

among themselves. In view of the manner that the trial judge distributed the assets over liabilities, the other adventurers will receive the benefit of any enhanced value of the property if any there is.

We do not find substance to the remaining contentions of the appellants.

Given the foregoing review of the evidence favorable to the appellees, we find no fraud or mismanagement under the above-cited authority, and find that the evidence is sufficient to uphold the trial court's judgment in this and all other respects.

Affirmed.