2011 WY 31

**Christian GUIER, M.D., Appellant (Petitioner),**

v.

**TETON COUNTY HOSPITAL DISTRICT, d/b/a St. John's Medical Center, Appellee (Respondent).**

**No. S-09-0259.**

Supreme Court of Wyoming.

Feb. 24, 2011.

---

Representing Appellant: Anna M. Reeves Olson and Weston W. Reeves, Park Street Law Offices, Casper, Wyoming. Argument by Mr. Reeves.

Representing Appellee: Mark A. Kadzielski, Fulbright & Jaworski, LLP, Los Angeles, California; Janet Lewis, Janet Lewis, PC, Jackson, Wyoming; Thomas E. Lubnau, II, Lubnau Law Office, PC, Gillette, Wyoming. Argument by Mr. Lubnau.

Before KITE, C.J., and GOLDEN, HILL, VOIGT *, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Dr. Christian Guier appeals from an order of the district court affirming a decision by St. John's Medical Center Board of Trustees to revoke his medical staff privi-

---

* *Chief Justice at time of oral argument.*

leges. After reviewing the entire record, we conclude the Board's decision is supported by substantial evidence, is not arbitrary or capricious, and is otherwise in accordance with law. We affirm.

## ISSUES

[¶ 2] Dr. Guier presents the following issues for review:

1. Whether Dr. Guier was denied his constitutional and statutory right to a contested case hearing when the Agency reversed the burden of proof.

2. Whether the Agency's breach of the Medical Staff Reappointment Agreement, by refusing to notify Dr. Guier of complaints that had been made against him, its disregard for its own policies, and its persistent concealment of evidence, renders its decision arbitrary and capricious.

St. John's styles the issues as follows:

1. Was the burden of proof applied appropriately in Dr. Guier's fair hearing? In any event was there substantial evidence to support the Board's final decision?

2. Did St. John's Medical Center provide Dr. Guier procedural due process?

3. Did St. John's Medical Center act arbitrarily and capriciously?

## FACTS

[¶ 3] Teton County Hospital District, doing business as St. John's Medical Center, is a Wyoming Governmental Agency organized pursuant to Wyo. Stat. Ann. §§ 35–2–401 through 35–2–404. St. John's Board of Trustees (Board of Trustees or Board) is an "agency" as defined by Wyo. Stat. Ann. § 16–3–101(b)(i). Medical Staff Bylaws govern the management of the Hospital and were adopted pursuant to Wyo. Stat. Ann. § 35–2–113. As a requirement of continuing medical staff membership, all physicians must periodically submit an application for reappointment. The application for reappointment requires physicians to abide by all

of the Bylaws, including those governing standards of professional conduct, and to sign a Code of Conduct resolution.

[¶ 4] Dr. Guier, an orthopedic surgeon, joined the medical staff in 1990. During his tenure, Dr. Guier exhibited disruptive behavior in the operating room on multiple occasions. Prior to the events leading to this litigation, the operating room staff at St. John's had refused to work with Dr. Guier on two occasions due to his disruptive behavior. The first of these incidents occurred in 1992 and the second occurred sometime between 1994 and 1996. A focused review of Dr. Guier's performance at the hospital was conducted from December 1, 2005 through May 31, 2006.[1] The summary report from that review stated that "[r]epeated instances of behavioral issues with Dr. Guier have created a strain in the working relationships between Dr. Guier and some members of the staff."

[¶ 5] In May of 2006, Dr. Guier completed an application for reappointment to the medical staff. As part of its consideration of Dr. Guier's application, the Medical Executive Committee (MEC), the professional review body at the Hospital, reviewed the focused report. In a June 21, 2006 letter, the Chief–of–Staff of the Hospital advised Dr. Guier that "the MEC is concerned about your professional conduct. Your inappropriate interactions with staff on several occasions, as noted in the focused review report, raise questions about your ability to work reasonably with others in the hospital." In July, the MEC recommended a six-month reappointment of Dr. Guier's privileges, on the conditions that Dr. Guier would sign a Medical Staff Reappointment Agreement and that the MEC would continue the focused review of his professional conduct and clinical performance for the entire term of the reappointment. The Reappointment Agreement identified several specific behavioral concerns and set forth the following conditions of reappointment:

 a. Dr. Guier shall not, under any circumstances, shout or otherwise raise his voice with any individual at St. John's, including but not limited to, nurses, administrative staff or other employees, Medical Staff members, patients or visitors. This includes responding to any individual who calls to discuss concerns or issues regarding Dr. Guier or his patients.

 b. Dr. Guier shall not, under any circumstances, make discourteous comments, including but not limited to, name calling, or give discourteous orders or demands to any individual at St. John's, including but not limited to, nurses, administrative staff or other employees, Medical Staff members, patients or visitors. This includes responding to any individual who calls to discuss concerns or issues regarding Dr. Guier or his patients.

 c. Dr. Guier shall not, under any circumstances, criticize any individual at St. John's in front of or within earshot of any other individual at St. John's, including but not limited to, nurses, administrative staff or other employees, Medical Staff members, patients or visitors. Dr. Guier will address any criticisms of or concerns about employees or staff members to the appropriate supervisor in a courteous manner and in private.

 d. Dr. Guier shall not threaten, physically or otherwise, any person at St. John's, including but not limited to, nurses, administrative staff or other employees, Medical Staff members, patients or visitors.

 e. Dr. Guier shall not exhibit any other inappropriate, unprofessional or disruptive behavior while on St. John's premises.

Dr. Guier signed the Reappointment Agreement on July 10, 2006, after writing his own "addendum," which he testified was "an avenue in which we could try and institute some reasonable process to try and deal with some

---

1. A focused review is authorized under the Medical Staff Bylaws as part of a "program (1) to monitor and assess the quality of professional practice in the Hospital and (2) to promote quality and efficiency of clinical and Hospital services by (a) providing education and counseling, (b) issuing letters of admonition, warning or censure, as necessary, and (c) requiring routine monitoring when deemed appropriate by the Medical Executive Committee."

**628**

of the issues that were at hand." The type-written addendum appeared at the bottom of the last page of the Agreement and was signed by Dr. Guier. It provided:

This agreement is signed with the understanding, that certain terms need to be defined, some facts or conclusions are in need of verification, and that the agreement is subject to acceptable amendments to be agreed upon in the near future. As a beginning we agree to due process in the event of any complaint brought against Dr. Guier and vice versa, by Dr. Guier against the Hospital Staff or Medical Staff. Due process is defined as (1) notification of a complaint (2) the nature of the complaint (3) an opportunity to respond and (4) call for witnesses (including the accusers with some exceptions)[.] Due process needs to be granted to all individuals from the beginning.

The Board of Trustees approved the six-month reappointment.

[¶ 6] In the ensuing months, several employees reported incidents of Dr. Guier's inappropriate behavior. Some of these incidents were verbally relayed to supervisors and others were also documented in written reports. The supervisors did not discuss the verbal reports with Dr. Guier at the time they were made. The workplace discord reached a crisis level on October 16, 2006 when the MEC was presented with a "Work Refusal Petition" signed by the entire operating room staff. The Petition stated:

This petition represents repeated documented occurrences in the operating room as well as psychological abuse in a hostile work environment. This petition also represents the concerns of the current operating room staff at St. John[']s Medical Center. These concerns are in reference to **Dr. Chris Guier** and his repeated abuse to the operating room staff. We have exhausted our pleas for change and have finally resorted to this method of resolution. As of this 16th day of October 2006, the Operating Room staff at St. John[']s Medical Center *refuses* to continue performing any cases with Dr. Chris Guier. The signatures below support this letter, as a much anticipated resolution is needed.

(Emphasis in original.) The MEC discussed the Petition with Dr. Guier at a meeting held the following day. At that meeting, the doctor in charge of the focused review shared the findings from the latest focused review report with Dr. Guier. The doctor explained that the most significant part of the report involved Dr. Guier's interaction with operating room personnel, and noted that all of the incident reports generated regarding Dr. Guier had been discussed with him by human resources. Dr. Guier acknowledged that he had reviewed the incident reports, but stated that no one had brought up to him that there were behavioral issues. He stated that the Petition came as a surprise to him because he made an attempt to address problems in the operating room as they arose.

[¶ 7] At the conclusion of the meeting, the Medical Executive Committee summarily suspended Dr. Guier's privileges for 29 days pending investigations by the Hospital's CEO and by an ad hoc committee created by the MEC. Dr. Guier was notified in writing of the suspension and of the fact that there was a request for an investigation pursuant to the Bylaws. The MEC informed Dr. Guier that

it was the unanimous consensus of the MEC that there are reasonable grounds to believe your conduct and activities pose a threat to the life, health, or safety of any patient, employee, or other person present at the Hospital and that the failure to take prompt action may result in imminent danger to the life, health or safety of any such person. Thus, the MEC decided to impose this temporary precautionary suspension.

[¶ 8] Dr. Guier was given the opportunity to provide information to the ad hoc committee at two meetings held on October 30th and 31st, 2006. The ad hoc committee presented its findings to the MEC on November 9, 2006. The committee reported six incidents between July and October of 2006 that it considered disruptive and abusive. The CEO presented a report with substantially similar findings. The MEC determined that the incidents sufficiently supported a recommendation that Dr. Guier's medical staff membership and clinical privileges be terminated. Dr. Guier was notified of the MEC's decision and his right to a contested case

hearing on the matter. He subsequently requested a contested case hearing.

[¶ 9] The contested case hearing was held over several evenings before a Judicial Review Committee (JRC) comprised of four physicians from the medical staff. The JRC was assisted by a hearing officer. The parties agreed that the Bylaws would apply to the contested case hearing unless they conflicted with the Wyoming Administrative Procedure Act (WAPA) or other applicable law. The parties also agreed that only Dr. Guier's behavior, not the quality of care provided to patients, was at issue. Dr. Guier took the pretrial depositions of several nurses, technicians, and operating room staff involved in the incidents. He was represented by counsel during the hearing, evidence was presented on his behalf, and he was provided the opportunity to cross-examine each witness.

[¶ 10] The JRC issued its Findings and Conclusions following the contested case hearing. It concluded that the application for reappointment and the terms of the Reappointment Agreement placed Dr. Guier on notice of expected standards of conduct. The JRC also concluded that Dr. Guier violated those standards during six separate incidents when he displayed anger or responded inappropriately 1) to the opening of an extra set of sponges; 2) to the suction not working properly during a procedure; 3) when a surgical supply item was unavailable; 4) to the loss of a bone fragment after surgery; 5) to the postponement of a surgical procedure and, during that procedure, to surgical items that were available but not opened; and 6) to the potential contamination of a gown. The JRC concluded that Dr. Guier had failed to prove that the MEC's decision to permanently suspend his privileges should be reversed or modified. Dr. Guier appealed the decision of the JRC to the Board of Trustees, as provided for in the Bylaws. The Board reviewed the entire record and found substantial evidence to support the MEC's action and recommendation.

[¶ 11] Dr. Guier appealed the Board's final decision to the district court. The district court found that some of the procedures used during the investigation and contested case hearing were flawed, but concluded that Dr. Guier's right to due process was not impacted. The district court determined that the Board's decision was supported by substantial evidence and affirmed the JRC's decision. Dr. Guier timely appealed to this Court.

### STANDARD OF REVIEW

[¶ 12] We review the Board's action as we would review any other agency's decision. *Reynolds v. West Park Hospital District*, 2010 WY 69, ¶ 6, 231 P.3d 1275, 1277 (Wyo.2010). When we consider an appeal from a district court's review of an administrative agency's decision, we review the case as though it had come directly from the administrative agency. *Id.* Our review of an agency decision is limited to those considerations specified in Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2009) which provides, in pertinent part:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record

of an agency hearing provided by statute.

[¶ 13] We affirm an agency's findings of fact if they are supported by substantial evidence. *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008). An administrative agency's conclusions of law are not entitled to the same deference as its factual findings. We review an agency's conclusions of law *de novo,* and "[w]e will affirm an agency's legal conclusion only if it is in accordance with the law." *DC Production Service v. Wyo. Dep't of Employment,* 2002 WY 142, ¶ 7, 54 P.3d 768, 771 (Wyo.2002). We employ the arbitrary and capricious standard as a safety net against administrative agency action that is contrary to law but not readily correctible under the other applicable standards of review. *Reynolds,* ¶ 6, 231 P.3d at 1277.

## DISCUSSION

[¶ 14] It is well-established that a hospital board may prescribe reasonable rules and regulations to be followed by physicians using the hospital facilities. *Board of Trustees of Memorial Hospital of Sheridan County v. Pratt,* 72 Wyo. 120, 262 P.2d 682, 688–89 (1953); *see also* 41 C.J.S., *Hospitals,* § 5, p. 336; 28 A.L.R.5th 107; *Green v. City of St. Petersburg,* 154 Fla. 339, 17 So.2d 517 (1944); *Selden v. City of Sterling,* 316 Ill. App. 455, 45 N.E.2d 329 (1942); *Bryant v. City of Lakeland,* 158 Fla. 151, 28 So.2d 106 (Fla.1946); *Jacobs v. Martin,* 20 N.J.Super. 531, 90 A.2d 151 (Ch.Div.1952). The Wyoming statute that governs hospital privileges provides individual hospitals broad discretion in the management of their staffs:

Any hospital owned by the state, or any hospital district, county or city thereof, and any hospital whose support, either in whole or in part, is derived from public funds, shall be open for practice to doctors of medicine, doctors of osteopathy, doctors of chiropractic, doctors of dentistry and podiatrists, who are licensed to practice medicine or surgery, chiropractic, dentistry or podiatry in this state. *Provided, however, that these hospitals by appropriate bylaws shall promulgate reasonable and uniform rules and regulations covering staff admissions and staff privileges.* Admission shall not be predicated solely upon the type of degree of the applicant and the governing body shall consider the competency and character of each applicant.

Wyo. Stat. Ann. § 35–2–113 (LexisNexis 2009) (emphasis added). We have said that it is improper for any court to substitute its judgment for that of a hospital concerning the management and operation of a health care facility. *Gonzales v. Personal Collection Service,* 494 P.2d 201, 206 (Wyo.1972). However, a physician may not be excluded by rules, regulations, or acts of the hospital's governing authorities which are unreasonable, arbitrary, capricious, or discriminatory. *Pratt,* 262 P.2d at 689. We have stated:

In reviewing a decision of a public hospital to refuse to grant or to terminate staff privileges of a physician, whether the review is conducted in the district court or in this court, the applicable standard of review is one which accords great deference to a hospital's decision. That review is limited to a determination of whether the exclusion was made on a rational basis, supported by substantial evidence, in accordance with reasonable hospital bylaws, and was not discriminatory, arbitrary, or capricious.

*Garrison v. Board of Trustees of Memorial Hospital,* 795 P.2d 190, 193 (Wyo.1990).

### Standard & Burden of Proof

[¶ 15] In his first issue, Dr. Guier asserts that the burden of proof in his contested case hearing is controlled by the Wyoming Administrative Procedure Act, and that the hearing examiner erred by applying the burden of proof identified in the Medical Staff Bylaws. We note initially that the proper allocation of the burden of proof is a matter of law and is reviewed *de novo. Penny v. State ex rel. Wyo. Mental Health Prof. Licensing Bd.,* 2005 WY 117, ¶ 13, 120 P.3d 152, 160 (Wyo.2005).

[¶ 16] Prior to the contested case hearing, the parties stipulated that "[t]he Medical Staff Bylaws of St. John's Medical Staff shall remain in full force and effect, and

shall apply to the Contested Case Hearing except where they are in conflict with the WAPA, or other applicable law and this Stipulation, in which case the WAPA, or other applicable law and this Stipulation, shall control." The hearing examiner determined that the burden of proof in the Bylaws did not conflict with the WAPA and instructed the JRC to apply the burden of proof provided for in the Bylaws. The Bylaw governing the burden of proof at hearings provides, in pertinent part:

VIII.D.7. BURDENS OF PRESENTING EVIDENCE AND PROOF

... [T]he professional review body that proposed the adverse recommendation or action shall present supporting evidence, but *the Medical Staff appointee shall have the burden of proving, by a preponderance of the evidence,* that the proposed adverse recommendation or action should be rejected and/or modified.

(Emphasis added.) The hearing examiner instructed the JRC as follows:

According to Section VIII.D.7 of the Bylaws, the MEC must first present evidence "in support of" its action and recommendation. To satisfy this initial obligation, the MEC does not have to prove that its action was the best or only action to take, or to establish that its decision was the "correct" one. Rather, to satisfy this initial obligation, the MEC only must show that its action and recommendation are supported by evidence or, in other words, that its action and recommendation are not arbitrary or capricious and are based on evidence that a reasonable mind might accept in support of the actions and recommendation.

*If you decide that the MEC has presented evidence "in support of" its action and recommendation, then, according to Section VIII.D.7 of the Bylaws, Dr. Guier has the burden of proving, "by a preponderance of the evidence" that the MEC's action and recommendation must be rejected or modified.*

(Emphasis added.) Dr. Guier asserts that the WAPA requires the MEC to prove its allegations by "clear and convincing evidence." He contends that this burden of proof conflicts with the burden identified in the Bylaws and therefore supersedes the provision in the Bylaws pursuant to the parties' stipulation.

 [¶ 17] The language of the WAPA does not expressly provide a standard of proof in contested case hearings. *See* Wyo. Stat. Ann. § 16–3–114(c). We have previously recognized that the standard applicable to an adjudicatory hearing before an agency, unless otherwise stated, is the "preponderance of the evidence" standard customarily used in civil cases. *Willadsen v. Christopulos,* 731 P.2d 1181, 1184 (Wyo.1987). A "preponderance of the evidence" is defined as "proof which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence." *Judd v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 85, ¶ 31, 233 P.3d 956, 968 (Wyo.2010). We have also recognized that the preponderance of the evidence standard generally does not adequately protect the property interest one has in a professional license, and have instead required a licensing board to prove its disciplinary cases by clear and convincing evidence. *Painter v. Abels,* 998 P.2d 931, 940 (Wyo.2000). Dr. Guier contends that our cases applying the WAPA to the revocation of professional licenses required the Hospital to prove the allegations supporting revocation of his privileges by "clear and convincing evidence." *See, e.g., In re Greene,* 2009 WY 42, ¶ 10, 204 P.3d 285, 290 (Wyo.2009) (suspension of chiropractor's license); *Dorr v. Wyo. Bd. of Cert. Pub. Accountants,* 2006 WY 144, ¶ 13, 146 P.3d 943, 949 (Wyo.2006) (suspension of certificate to practice public accounting); *Devous v. Wyoming State Bd. of Med. Examiners,* 845 P.2d 408, 416 (Wyo.1993) (suspension of medical license). The Hospital asserts that the clear and convincing standard does not apply because Dr. Guier faced the revocation of his medical staff privileges, not the revocation of his medical license.

[¶ 18] A "license" is defined in the WAPA as "any agency permit, certificate, approval, registration, charter or similar form of permission required by law." Wyo. Stat. Ann. § 16–3–101(b)(iii). The Hospital argues that staff privileges are not a medical license. It

points out that Dr. Guier still has his license to practice medicine in the State of Wyoming, and is able to practice his profession at other facilities in the state. Dr. Guier asserts that staff privileges are required by law in order for him to perform operations, admit patients to a hospital, and treat patients, and that privileges therefore meet the definition of a "license." He supports this position by citing to Bylaw § V.A.1 which prohibits any person from admitting a patient or providing medical treatment unless they have been granted privileges. That Bylaw also states that medical staff privileges are "in the nature of a license."

[¶ 19] Although medical staff privileges may be "in the nature of" a license, we find there is a clear and important distinction between hospital privileges and a medical license. Medical staff privileges allow a physician to use hospital facilities and be assisted by hospital staff. As Dr. Guier points out, this includes the authority to admit and treat patients. A medical license, however, confers a general right to practice medicine within the boundaries of a particular jurisdiction. The distinction between a medical license and staff privileges is acknowledged in Wyoming, as indicated by the fact that licensing and privileging decisions are granted to different administrative bodies.

[¶ 20] Pursuant to statute, the Wyoming Board of Medicine, not the Judicial Review Committee or the Boards of Trustees of individual hospitals, oversees physician licensing matters. Title 33, Chapter 26 of the Wyoming statutes, known as the "Medical Practice Act," provides rules relating to licensing of physicians. The Medical Practice Act empowers the Wyoming Board of Medicine to "[g]rant, refuse to grant, suspend, restrict, revoke, reinstate or renew licenses to practice medicine," and lists more than thirty specific reasons justifying revocation, restriction, or suspension of a medical license. Wyo. Stat. Ann. §§ 33–26–202(b)(i), 33–26–402(a)(i)–(xxxiv). The Act provides a clear and convincing burden of proof and allocates the burden to the Wyoming Board of Medicine. Wyo. Stat. Ann. § 33–26–407. The Act defines a "license" as "a license to practice medicine in this state issued by the board pursuant to this chapter" and clearly distinguishes between a license and medical staff privileges. Wyo. Stat. Ann. § 33–26–102(a)(ix); see Wyo. Stat. Ann. §§ 33–26–202, –303 to –409.

[¶ 21] Medical staff privileges, on the other hand, are addressed in the Wyoming Public Health and Safety statutes relating to hospitals and other care facilities. The statute governing hospital privileges expressly entrusts matters of staff admissions and privileges to hospital administration. As stated above, that statute provides that "hospitals by appropriate bylaws shall promulgate reasonable and uniform rules and regulations covering staff admissions and staff privileges." Wyo. Stat. Ann. § 35–2–113. Staff privileges, in contrast to medical licenses, are specific to individual hospitals, and decisions regarding staff privileges are within the discretion of hospital management. The cases that Dr. Guier cites involving license suspensions are inapposite. In this case, Dr. Guier faced the revocation of his medical staff privileges. The Hospital, pursuant to its prerogative, decided that privileging decisions would be subject to a burden of proof expressly identified in the Bylaws, and the burden of proof set forth in those Bylaws was applied at the contested case hearing. Dr. Guier agreed to be bound by the Bylaws when he initially sought hospital privileges and in his subsequent application for reappointment. The Bylaws do not require a clear and convincing burden of proof and do not require the burden of proof to be carried by the Hospital.

[¶ 22] Dr. Guier also asserts that his loss of privileges is similar to the loss of his medical license because it has impacted his ability to earn a living by practicing medicine. He stated that the termination of his privileges was reported to the National Practitioner Data Bank as required by federal law. 42 U.S.C. § 11133(a)(1)(A). As a result of the reporting and subsequent notification to other hospitals, Dr. Guier stated that he had lost privileges at a nearby hospital, and was called to hearings before the Wyoming and Montana Boards of Medicine. We note that Dr. Guier did not provide details of those hearings and did not testify that revo-

cation of his hospital privileges resulted in revocation of his license to practice medicine in Montana or Wyoming. We do not dispute that the loss of privileges at a particular hospital or health care facility may seriously impact a physician's ability to maintain a medical practice.

[¶ 23] Under Wyo. Stat. Ann. § 33–26–303(d), the Board of Medicine may deny licensure to a person whose privileges have been revoked at a particular health care facility on that basis alone. Also, under Wyo. Stat. Ann. § 33–26–402(a)(xxvi)(A), a license may be revoked based on any action by a health care entity that adversely affects clinical privileges for a period of thirty or more days. The fact that there may be additional consequences to a physician who loses staff privileges, however, does not impair the ability of a hospital to establish reasonable bylaws and requirements for physicians seeking hospital privileges at its facility, and does not transform a privilege to practice at a particular hospital into a medical license. In this case, Dr. Guier was aware that his professional behavior was under intense scrutiny, as indicated by the focused review of his performance, the Reappointment Agreement, and correspondence during the reappointment application process. He was aware that failure to abide by the Reappointment Agreement could result in the loss of privileges and consequently damage his career. In spite of the terms of his Reappointment Agreement, however, Dr. Guier continued to act in a manner that jeopardized his ability to practice at St. John's and other facilities where he had privileges.

[¶ 24] The WAPA does not mandate a clear and convincing burden of proof for suspension of hospital privileges. Wyo. Stat. Ann. § 35–2–113 provides broad discretion to a hospital in determining requirements for the ability to practice at a particular hospital. We have previously recognized that a hospital is entitled to great deference in the management of its facility and we afford great deference to the hospital's determination of standards relating to hospital privileges. *Garrison,* 795 P.2d at 193. In sum, the Hospital was entitled to establish the burden of proof to be applied. While it is not the level of proof that every hospital might adopt, we cannot find that it is unreasonable or that it conflicts with the WAPA.

[¶ 25] Dr. Guier also argues that, even if a clear and convincing standard of proof does not apply, Bylaw § VIII.D.7 is not reasonable because it places the burden on the physician facing charges to show that the adverse recommendation should be rejected or modified. Pursuant to the Bylaws, the Medical Executive Committee has the burden of producing evidence supporting its recommendation. Once that evidence is produced, the burden shifts to the medical staff appointee to persuade the JRC that the action should not be taken. Dr. Guier asserts that the burden-shifting under the Bylaws logically requires him to carry both the burden of production and the burden of persuasion, and that the practical effect of requiring the MEC to produce "some evidence" supporting its decision does not in any way assuage his burden. However, our conclusion that the Hospital has discretion to enact reasonable and uniform rules and regulations, based on an express statutory grant of that power, obviates the need for a discussion regarding the effect of burden-shifting under the Bylaws. As indicated above, we do not find that the Hospital's decision to place the burden of proof on the medical staff appointee, and to require that the burden be met by a preponderance of the evidence, is unreasonable.

*Substantial Evidence*

[¶ 26] Although somewhat entangled in his standard of proof argument, Dr. Guier also appears to contend that the Board's decision was not supported by substantial evidence. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. *Dale,* ¶ 11, 188 P.3d at 558.

[¶ 27] Dr. Guier asserts that the record lacks substantial evidence to support each of the six incidents of his misbehavior. He contends that several incidents were not documented by written reports. Of the written reports that were made, Dr. Guier claims they did not contain the level of detail required to determine he violated the applica-

tion for reappointment or the Reappointment Agreement. He also maintains that the ad hoc committee learned of several of the incidents from individuals who did not actually witness the outbursts.

[¶ 28] The Medical Staff Bylaws require a medical staff member to "agree to work harmoniously with others;" to "work[ ] cooperatively with members, nurses, Hospital Administration and others so as to promote high quality patient care;" and to adhere to a professional code of conduct, which includes "the ability to relate to others in a civil, collegial, and courteous manner." Bylaws §§ II.B.1.e; II.E.7; II.E.14. The Code of Conduct provides:

> The policy of St. John's Medical Center & Living Center is that all individuals within its facilities be treated courteously, respectfully and with dignity. . To that end, while in St. John's facilities, individuals who are granted medical privileges agree to conduct themselves in a professional and cooperative manner. All such individuals shall refrain from disruptive, abusive, rude, hostile or otherwise inappropriate conduct.

[¶ 29] The record contains ample evidence of Dr. Guier's inability to work cooperatively with others, to relate to others in a civil, collegial, and courteous manner, and to refrain from disruptive conduct. Six members of the operating room staff who worked directly with Dr. Guier testified at the contested case hearing, as did the Chief-of-Staff, Chief-of-Surgery, and Operating Room Supervisor. The written reports of the ad hoc committee and the CEO investigation were submitted as evidence. The head of the ad hoc committee and the CEO also testified during the contested case hearing regarding those reports.

[¶ 30] The decision to permanently suspend Dr. Guier's privileges was based on six separate incidents of misconduct. Dr. Guier does not dispute that these incidents occurred. He either could not remember the incidents or contends the incidents were not as serious as reported. All incidents involved anger, mistreatment of staff, and disruptive behavior, and all incidents demonstrated an inability to relate to others in a civil, collegial, and courteous manner. The

evidence supporting those incidents can be summarized as follows:

July 18, 2006: Two nurses testified that Dr. Guier became angry during a procedure when the operating room staff used unauthorized materials. One nurse stated that when Dr. Guier realized an extra set of surgical sponges had been opened he stopped what he was doing, became angry and red in the face, was shaking, and yelling, "like level 10 yelling." This incident occurred eight days after Dr. Guier signed the Reappointment Agreement.

July 20, 2006: Two nurses testified that Dr. Guier yelled and was intimidating toward operating room personnel during a procedure in which an instrument's suction was not working properly.

July 21, 2006: Two nurses testified that Dr. Guier became upset when a surgical supply item was unavailable. Both nurses testified that Dr. Guier forcefully tore the drapes off the patient and threw a pair of scissors during this incident. The incident was also documented in an incident report.

October 2, 2006: An incident report stated that Dr. Guier became angry with the operating room staff when he learned of the mishandling of a bone fragment. A nurse involved in the incident testified that Dr. Guier "was so angry. He started coming at me." Dr. Guier accused the nurse of sabotage when he learned the fragment had been discarded.

October 9, 2006: A nurse testified that Dr. Guier became angry when surgery was postponed because of a room conflict. Another member of the operating room staff testified that, after a room was arranged, Dr. Guier yelled at operating room personnel during the procedure for not unwrapping items that would be needed, though they were available in the room.

October 11, 2006: The investigation by the ad hoc committee revealed that Dr. Guier reacted angrily to the possible contamination of his surgical gown. According to the committee's report, Dr. Guier grabbed the gown from one of the operating room staff members, threw the gown to the floor, and made a demeaning comment to the staff member. Dr. Guier defended his behavior

by stating that he prefers to take his own gown to decrease the possibility of infection. According to the committee's report, Dr. Guier stated that he discussed the incident with another doctor, who agreed that Dr. Guier's reaction could be interpreted as demeaning.

[¶ 31] The Judicial Review Committee and the Board of Trustees found that all of these incidents were supported by substantial evidence. We agree with this conclusion. The incident where Dr. Guier was alleged to have angrily thrown a contaminated gown on the floor was based on hearsay. Nonetheless, hearsay is admissible in administrative proceedings if it is probative, trustworthy, and credible, and otherwise satisfies the requirements of Wyo. Stat. Ann. § 16–3–108. *Story v. Wyoming State Board of Medical Examiners*, 721 P.2d 1013, 1018 (Wyo.1986). Further, Dr. Guier did not deny that this incident occurred. The other incidents were testified to by eye-witnesses and several were corroborated by more than one witness. The six members of the operating room staff who testified at the contested case hearing provided evidence of Dr. Guier's disruptive behavior. All six members of the staff testified that they would continue to refuse to operate with Dr. Guier if his privileges were reinstated. We are satisfied that there is substantial evidence supporting the JRC's decision to revoke Dr. Guier's medical staff privileges.

[¶ 32] We also cannot find error in the Board's conclusion that Dr. Guier did not carry his burden of proving, by a preponderance of the evidence, that the recommendation should be set aside or modified. Dr. Guier presented some conflicting evidence regarding his conduct in the operating room. One physician's assistant who frequently worked with Dr. Guier testified in support of Dr. Guier. In reference to Dr. Guier's professional behavior, the physician's assistant stated: "I've never heard Dr. Guier raise his voice.... I've never heard him call people names," and "I've never heard him use profanity in any form, even when we're out—you know, outside of the OR. It's just not in his nature." He testified that the OR is a very loud and sometimes stressful place and that

Dr. Guier's voice may have taken on a stressor during several of the incidents, but that he did not witness Dr. Guier lose his temper during any of the incidents. Dr. Guier also called one other doctor on his behalf, who testified that Dr. Guier did not have any behavioral problems at any of the other hospitals at which he had privileges to practice.

[¶ 33] Dr. Guier also testified at the contested case hearing. He did not recall several of the incidents. He admitted to being angry when he found out about the mishandling of the bone fragment. However, he denied yelling, approaching anyone in a threatening manner, or losing his focus on the patient.

[¶ 34] The JRC, as the trier of fact, was in the best position to determine the credibility of the witnesses and to weigh the evidence. Upon weighing the evidence, the JRC found that "Dr. Guier failed to meet his burden of proving, by a preponderance of the evidence, that the decision of the Medical Executive Committee to permanently suspend his privileges should be reversed or modified." The JRC found that the documentary and testimonial evidence demonstrated that Dr. Guier engaged in unacceptable personal conduct. Given the extensive testimony regarding Dr. Guier's conduct in the operating room, and the ample documentation produced by the investigations of the ad hoc committee and the Hospital's CEO, we cannot conclude the JRC erred in determining that Dr. Guier had not met his burden of proof.

### Arbitrary & Capricious

[¶ 35] In his last issue, Dr. Guier asserts that the Board's decision was arbitrary and capricious. The arbitrary and capricious standard remains as a "safety net" to catch agency action that prejudices a party's substantial rights or that may be contrary to the other WAPA review standards yet is not easily categorized or fit to any one particular standard. *Dale*, ¶ 23, 188 P.3d at 561.

Underlying our often repeated statement that "in determining whether the action of an agency is arbitrary, capricious, or an abuse of discretion, the court ascertains

whether the decision is supported by the record," is the assumption that an agency will abide by the rules it promulgates. The failure of an agency to abide by its rules is per se arbitrary and capricious. *Bowen v. Wyoming Real Estate Comm'n*, 900 P.2d 1140, 1142 (Wyo.1995) (citation omitted).

[¶ 36] Dr. Guier contends that the Board's decision was per se arbitrary and capricious because the Medical Executive Committee did not follow the notice procedures provided for in the Reappointment Agreement or the Hospital's internal Disruptive Practitioner Policy. The Disruptive Practitioner Policy provides that if disruptive behavior is reported, the Chief-of-Staff and CEO shall meet with the practitioner, discuss the incident, and document all meetings and conversations concerning the behavior. However, the last paragraph of the policy also provides:

> Notwithstanding the foregoing, at any time an issue pertaining to a practitioner's disruptive conduct may be referred to the Medical Executive Committee. Such referral may lead to a formal investigation and corrective action as set forth in the Medical Staff bylaws. Nothing in this policy shall be interpreted to prevent the Medical Executive Committee from exercising its prerogatives in these matters. This policy presents an informal approach to dealing with a disruptive practitioner, which does not replace the right of the Medical Executive Committee to exercise its powers as set forth in the Medical Staff bylaws.

The MEC chose to bypass the Hospital's Disruptive Practitioner Policy, and opted to address the disruptive conduct under the Bylaws, which was its right under the policy. The Disruptive Practitioner Policy is not a rule promulgated by the Hospital. It is designated a "policy" and does not carry the authority of the Medical Staff Bylaws. Likewise, the Reappointment Agreement is not a hospital rule or regulation. We note that the MEC failed to adhere to the "critical" documentation standards of the Disruptive Practitioner Policy, and that none of the suggested steps were taken by the Hospital's CEO or

Chief-of-Staff to resolve the problems informally. Nonetheless, the Disruptive Practitioner Policy does not replace the right of the MEC to exercise its powers under the Medical Staff Bylaws. The MEC was entitled to proceed under the Bylaws and its decision to do so was not arbitrary or capricious.

[¶ 37] The Medical Executive Committee was required to follow the formal procedures provided for in its Bylaws, which were promulgated pursuant to statute. The record reflects that it did that. The MEC, finding that the Work Refusal Petition prevented the Hospital from properly staffing the OR, creating a threat to the life, health and safety of its patients, summarily suspended Dr. Guier's privileges for 29 days according to Bylaw § VII.C.1. Following the summary suspension, the MEC appointed an ad hoc committee to investigate the incidents as required by Bylaw § VII.B.3. The MEC determined that the ad hoc committee's investigation supported a recommendation that Dr. Guier's medical staff membership and clinical privileges be terminated pursuant to Bylaw § VII.B.4. Dr. Guier was immediately notified of the decision and his right to a contested case hearing on the matter in accord with Bylaw § VII.B.5. A contested case hearing was held by the JRC and Dr. Guier was afforded an appeal to the Board of Trustees according to Bylaws §§ VIII.D and VIII.E. We cannot conclude that the MEC did not follow its rules and regulations.

[¶ 38] Although he does not expressly argue that the Medical Executive Committee violated his due process rights, Dr. Guier makes much of the fact that the MEC did not notify him immediately of each incident of inappropriate behavior. We note initially that Dr. Guier does not actually contend that he lacked notice of the issues that were considered at the contested case hearing. Rather, he asserts that had the MEC discussed and documented complaints regarding his professional conduct prior to the Work Refusal Petition, he could have apologized and been admonished if necessary. He claims "[t]he controlling question is whether good faith work with Dr. Guier of the kind pledged would have saved his career." Dr. Guier received notice of the charges against

him, a hearing before an impartial tribunal, representation by counsel, the opportunity to cross-examine witnesses and to present evidence, and the opportunity to inspect documentary evidence against him. In light of the ample process that was provided to contest the decision of the MEC, we cannot conclude that the Board's decision was arbitrary or capricious. While it may have been possible to resolve informally under the methods of conflict resolution identified in the Disruptive Practitioner Policy, the fact that the MEC did not follow its recommended procedures does not violate Dr. Guier's due process rights.

[¶ 39] "Parties to administrative proceedings are entitled to due process of law. Procedural due process principles require reasonable notice and a meaningful opportunity to be heard." *Amoco Production Co. v. Wyoming State Bd. of Equalization,* 7 P.3d 900, 905 (Wyo.2000) (internal citations and quotation marks omitted). Dr. Guier signed an application for reappointment and a Reappointment Agreement, both of which specifically articulated the professional behavior expected of those with medical staff privileges. We find no error in the Board's conclusion that the "Reappointment Agreement placed Dr. Guier on unequivocal notice that his personal conduct had been an issue and would be closely scrutinized during the period of his reappointment to the medical staff." Dr. Guier's testimony indicated his awareness of issues relating to his interactions with operating room personnel and he was clearly aware of the type of behavior which would be considered unacceptable under the Medical Staff Bylaws and the Reappointment Agreement.

[¶ 40] Having reviewed the record we cannot conclude that the Board's decision was arbitrary, capricious, or otherwise not in accordance with law. We affirm the Board's decision for reasons articulated by the Oregon Supreme Court when faced with a similar situation:

Most other courts have found that the factor of ability to work smoothly with others is reasonably related to the hospital's object of ensuring patient welfare. This conclusion seems justified for, in the

modern hospital, staff members are frequently required to work together or in teams, and a member who, because of personality or otherwise, is incapable of getting along, could severely hinder the effective treatment of patients.... Hospitals uniformly consider cooperativeness an important factor, and in these circumstances it seems questionable whether this court should gainsay the hospitals' experience and judgment in this matter.

*Huffaker v. Bailey,* 273 Or. 273, 540 P.2d 1398, 1400–01 (1975) (footnotes omitted).

[¶ 41] Affirmed.