2011 WY 52

Sherry LANE–WALTER, Appellant (Petitioner),

v.

STATE of Wyoming, ex rel., WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent).

No. S–10–0087.

Supreme Court of Wyoming.

March 24, 2011.

Representing Appellant: George Santini of Ross, Ross & Santini, LLC, Cheyenne, WY.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; James Michael Causey, Senior Assistant Attorney General; and Kelly Roseberry, Assistant Attorney General. Argument by Ms. Roseberry.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellant, Sherry Lane–Walter (Lane–Walter), challenges an order of the district court which affirmed the decision of a Medical Commission Hearing Panel (Medical Commission). The Medical Commission's order denied the benefits Lane–Walter sought for a back surgery procedure. Benefits were denied on the basis that the surgical procedure at issue, to implant an X STOP® [1] device in Lane–Walter's back, did not qualify as "reasonable and necessary medical care." Lane–Walter contends that she was entitled to that "medical care" under paragraph 7 of the settlement agreement that she reached with the Wyoming Workers' Safety and Compensation Division on May 19, 1997. In addition, Lane–Walter sought preauthorization for the surgery and was told by the Wyoming Workers' Safety and Compensation Division (Division) that preauthorization was not required in her case. After the surgery had been successfully completed and Lane–Walter had recovered much of her ability to perform the usual activities of her daily life, albeit with some disability still remaining, all of the claims submitted to the Division by her health care providers were denied. The basis for the denial was that the surgery at issue was "not reasonable or medically necessary."

[¶ 2] We will reverse the order of the district court which affirmed the Medical Commission's decision. Furthermore, we remand this matter to the district court with directions that it further remand it to the Division with directions that Lane–Walter's claims for the X STOP surgery be paid because the Division's and the Medical Commission's decisions that the surgery was not "reasonable or medically necessary" are not sustainable under our prevailing standard of

---

1. The X STOP® is an interspinous decompression system. This medical device is indicated for treatment of patients age fifty (50) or older suffering from intermittent neurogenic claudication secondary to a confirmed diagnosis of lumbar spinal stenosis. It is a titanium implant that fits between spinous processes of the lumbar spine. It is made from titanium alloy and consists of two components: a spacer assembly and a wing assembly.

review, given the unique facts and circumstances of this case.

## ISSUES

[¶ 3]   Lane–Walter poses these as the issues for our resolution:

1.   Is the decision of the Medical Commission arbitrary and capricious for the reason that it omitted material evidence from its Findings of Fact, Conclusions of Law and Order?

2.   Did the Medical Commission improperly [rely] upon medical opinions which were based upon an inadequate foundation?

3.   Was it arbitrary, capricious, and an abuse of discretion to apply the Wyoming Workers' Safety and Compensation Division's preauthorization guidelines to deny claims for medical treatment when [Lane–Walter] and her treating surgeon were informed [by the Division] that those guidelines and procedures were not applicable to her claim?

The Division articulates the following as the pertinent issues:

I.   Are the findings of the Medical Commission arbitrary, capricious, or otherwise not in accordance with Wyoming law?

II.   Can the Medical Commission's use of the FDA Preauthorization Guidelines to determine medical reasonability and necessity be properly raised for the first time on appeal, and does it exceed its authority?

## FACTS AND PROCEEDINGS

[¶ 4]   Lane–Walter worked for FMC Corporation in Sweetwater County, Wyoming. She operated a roof bolter in an underground mine. She suffered an injury to her back in November of 1982, and again in November of 1984, when she was approximately 30 years of age. The record demonstrates that Lane–Walter never went back to any meaningful work after her 1984 injury, although the details of all the surgical procedures that were performed between 1984 and 1994 are not included in the record on appeal. It suffices to note here that Lane–Walter's post-injury medical condition appears to have been exacerbated by a series of unsuccessful surgeries that were intended to restore her to a condition of health so that she could return to some form of gainful employment. That goal was never reached. Because she lived in southwestern Wyoming, Lane–Walter received much of her initial medical treatment in Utah, and she continued to rely on those physicians even after she moved to northern Wyoming.

[¶ 5]   The record also reflects that Lane–Walter's interaction with the Division was extremely unsatisfactory, in her eyes, and that her efforts to obtain medical treatment and worker's compensation benefits were often frustrated by the Division. See, e.g., *FMC v. Lane*, 773 P.2d 163 (Wyo.1989). On May 19, 1997, the Division and Lane–Walter entered into an agreement that was entitled "Order Approving Stipulation and Awarding Benefits":

1.   The Employee–Claimant [Lane–Walter] was injured in an industrial accident on November 15, 1984.

2.   [Lane–Walter] has already received substantial payments for temporary total disability, permanent total disability, extended benefits pursuant to § 27–14–405(b) W.S.1977 (1983 repl.), and payment of substantial medical bills.

3.   [Lane–Walter's] claims for extended permanent total disability benefits pursuant to § 27–12–405(d) W.S.1977 (1983 repl.), and subsequent revisions thereof, and any and all future awards for disability, including but not limited to permanent partial, temporary total, loss of earnings or extended benefits are settled for the one time lump sum payment of $70,000.00.

4.   [Lane–Walter] shall submit to a complete Independent Medical Evaluation with Dr. Nielsen of Provo, Utah, or Dr. Stephen Emery of Cody, Wyoming.

5.   [Lane–Walter] shall submit to a functional capacities examination to evaluate her current physical capabilities, including progress, malingering, regression, symptom magnification or status quo.

6.   [Lane–Walter] shall submit to a complete psychological evaluation. Said evaluation will include all current psychological conditions, all pre-existing psychological

conditions and all psychological conditions which are a result of the industrial injury.

7. The Division will pay only for medical treatments related to the work place injury, as per statute and fee schedule.

8. The Division will pay all travel costs associated with the above described evaluations and assessments.

9. Except for the evaluations specified in paragraphs 4, 5, and 6 above, the Division will not pay travel expenses for any out of state medical treatments or procedures for [Lane–Walter] in the future. The Division will continue to pay travel expenses for in state treatments or procedures for [Lane–Walter] which are related to the industrial injury.

10. [Lane–Walter's] claim for extended permanent total disability benefits as described above are dismissed with prejudice as to any future action.

11. The Division reserves the right to object to the payment for any medical procedures or treatments which are not related to the industrial injury.

[¶ 6] Lane–Walter had the last of her initial series of surgeries in 1994. After the above-quoted agreement was finalized, Lane–Walter continued to treat with orthopedic surgeons Jonathan Horne, M.D., and then his brother, Robert Horne, M.D. Although the subject of additional surgeries came up often in the meantime, Lane–Walter was opposed to any further surgery because prior surgeries had only served to increase her disability and loss of enjoyment in living. As is evidenced in much of the material contained in this record, Lane–Walter not only suffered the back injury and its associated pain, but she also suffered generalized pain, depression, anxiety, sleeplessness, and hostility toward both her healthcare providers and the Division. As a generalization, we will note here that both the Division and Medical Commission treated these side effects as being very significant in denying her benefits in the instant proceedings.

[¶ 7] The Medical Commission included in its findings a reference to one page of a four-page document, to which was appended a second document 19 pages in length. Those documents appear to have originated from the Department of Health and Human Services, Public Health Service, Food and Drug Administration. The Commission included most of the conclusions that were drawn as to clinical studies (a description of the kinds of patients who were likely to benefit from its implantation) but deleted this: "A significantly greater proportion of X STOP patients achieved overall treatment success, compared to control patients." Immediately following the material quoted by the Commission is this:

> The X STOP device met the primary clinical study endpoint for success, exceeding the success rate of the control in every statistical analysis. The implant resulted in a low percentage of complications, each of which resolved without significant clinical sequalae and no neurological or vascular injuries. The X STOP implantation procedure is a much less invasive procedure than other surgical decompressive procedures such as laminectomy, and can often be performed under local anesthesia. The procedure preserves local anatomy so that, should device removal become necessary, additional surgical options such as laminectomy are not precluded.

[¶ 8] Lane–Walter's attending surgeon testified at length about his assessment of her for the X STOP surgery. That testimony established that Lane–Walter met all of the "Indications for Use" prescribed by the manufacturer. Dr. Horne also testified that he had assured himself that Lane–Walter met all the criteria on the "Preauthorization Check Sheet," although he did not fill one out and send it to the Division, because the Division had informed him that was not necessary.

[¶ 9] Lane–Walter finally began to move in the direction of reconsidering surgery in 2007, when Dr. Horne recommended an X STOP® implant and because the pain she was suffering had become intolerable. Lane–Walter claimed, and the Division did not deny or in any way attempt to rebut, that she was told the surgery did not require preauthorization. The surgery was very much a success from Dr. Horne's and Lane–Walter's points of view.

[¶ 10]   In late 2007, the Division finally gave recognition to the X STOP procedure and created a preauthorization form for that procedure. The evidence heard by the Medical Commission demonstrated that Lane–Walter's surgeon ascertained that she fit all of the criteria established by the manufacturer for use of the X STOP®. However, her surgeon did not actually fill out the form because the Division determined that Lane–Walter was not required to obtain "preauthorization" and the document was entitled a "Preauthorization Checklist." The documentation contained in the record on appeal reveals that the X STOP® has been in generalized use throughout the "industrialized democracies" of Europe, Asia, Africa, and the South Pacific since 2001, and was approved by the FDA in the United States in 2005. The Division gave tentative recognition to it in late 2007. Dr. Horne, who treated Lane–Walter, was deemed not to be a credible witness because he had been intemperately critical of the Division, the Medical Commission, and the experts hired by the Division, for their apparent ignorance with respect to the benefits of the X STOP procedure. We think it hardly needs to be said that the Medical Commission acted arbitrarily and capriciously, if not punitively, in utilizing Dr. Horne's intemperate words as a factor in denying Lane–Walter benefits to which she was entitled under the terms of her settlement with the Division.

[¶ 11]   After the surgery, Lane–Walter continued to use many of the same prescription medications, including pain medication, as she had before the surgery, but at a much reduced level. Both the Division and the Medical Commission treated her continued use of those medications as proof that the surgery was not "reasonable or necessary"— or successful—even though both subjective and objective data pointed very much to the contrary.

[¶ 12]   The Division used two Independent Medical Evaluations (IMEs) to attempt to rebut Dr. Horne's testimony and the documentary record. We note at the outset that the evaluations refer to documents, but there is no way to ascertain from the reports themselves which document is being cited or which, if any, of those "voluminous records" are actually in the record on appeal. The first was done by Judson Cook, M.D., on April 10, 2008. He did not actually see or talk to Lane–Walter. In his report, Dr. Cook concludes that he does not think the problems that Lane–Walter was encountering in 2008 could be related back to the original injury, although that was not at issue in these proceedings. He also concludes that he would not have authorized the X STOP procedure had he been the attending physician, but he might change his mind if he saw additional documentation. Such documentation existed, but Dr. Cook did not have it available to him. It could be said that he overruled the medical advice given by Dr. Horne, who was intimately familiar with Lane–Walter's 24–year–long medical history, with a two and one-half hour review of "some" of the pertinent medical records and without seeing any of the radiological data upon which Dr. Horne had relied. Most importantly, Dr. Cook changed the tenor of his IME considerably when he testified at the hearing.

[¶ 13]   The second IME was done by Stephen F. Emery, M.D. He prepared his report on May 5, 2008. He too did not actually see or talk to Lane–Walter. He indicates in the first paragraph of his review that it was directed at ascertaining whether or not Lane–Walter met the criteria set out in the preapproval checklist and never really makes mention of the matter of whether it was reasonable or medically necessary. His conclusion is that a nurse said that Lane–Walter was still in a lot of pain after the surgery, and that the patient miraculously no longer felt numbness in her toes, even though the surgery could not have produced such an effect. It is significant that Dr. Emery focused much of his attention on a 1992 psychological evaluation that indicated that Lane–Walter was not a good candidate for further surgery, at that time, nearly 16 years previous to the surgery at issue here. He spent a total of six hours on his report.

[¶ 14]   What appears to be a fairly complete summary of Lane–Walter's medical history appears in the record on appeal in the form of an IME done by Karl Douglas Niel-

sen, M.D., F.A.C.S., in 1998. It appears that this evaluation was done at the behest of the Division so as to establish a baseline for the administration of the settlement agreement reached between the Division and Lane–Walter. It is evident that neither Dr. Cook nor Dr. Emery saw this document, although the Medical Commission made brief reference to it.

## DISCUSSION

### Standard of Review

[¶ 15] The issue the Medical Commission considered was this:

> Whether various medical treatments including preoperative tests/examinations, postoperative visits, and surgery that was performed on February 15, 2008, are considered reasonable and medically necessary as related to [Lane–Walter's] back injury that occurred November 15, 1984, and are therefore compensable.

[¶ 16] We apply the standard of review we articulated in *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶¶ 22–24, 188 P.3d 554, 561 (Wyo.2008):

> ... [I]n the interests of simplifying the process of identifying the correct standard of review and bringing our approach closer to the original use of the two standards, we hold that henceforth the substantial evidence standard will be applied any time we review an evidentiary ruling. When the burdened party prevailed before the agency, we will determine if substantial evidence exists to support the finding for that party by considering whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. See, *Wyo. Consumer Group v. Public Serv. Comm'n of Wyo.*, 882 P.2d 858, 860–61 (Wyo.1994); [*Bd. of Trustees,*

*Laramie County School Dist. No. I v.] Spiegel*, 549 P.2d [1161] at 1178 [ (1976) ] (discussing the definition of substantial evidence as "contrary to the overwhelming weight of the evidence"). If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

> The arbitrary and capricious standard remains a " 'safety net' to catch agency action which prejudices a party's substantial rights or which may be contrary to the other W.A.P.A. review standards yet is not easily categorized or fit to any one particular standard." *Newman* [*v. State ex rel. Wyo. Workers' Safety and Comp. Div.*], ¶ 23, 49 P.3d [163] at 172 [ (Wyo.2002) ]. Although we explained the "safety net" application of the arbitrary and capricious standard in *Newman*, we will refine it slightly here to more carefully delineate that it is not meant to apply to true evidentiary questions. Instead, the arbitrary and capricious standard will apply if the hearing examiner refused to admit testimony or documentary exhibits that were clearly admissible or failed to provide appropriate findings of fact or conclusions of law. This listing is demonstrative and not intended as an inclusive catalog of all possible circumstances. *Id.*

> There will be times when the arbitrary and capricious standard appears to overlap with some of the other standards. For example, a decision against the great weight of the evidence might properly be called arbitrary or capricious in everyday language. However, the words "arbitrary" and "capricious" must be understood in context as terms of art under the administrative review statute and should not be employed in areas where the more specifically defined standards provide sufficient relief.

[¶ 17] This case presents an unusually narrow and ill-defined issue. It was long-ago established, and it is still very much a governing fact, that Lane–Walter's back problems stemmed from a work-related injury, and that under the settlement agreement set out above, the Division is obligated to pay for reasonable and medically necessary treatment incidental to that injury. In this proceeding, she did not carry any burden in that regard, i.e., her injury is work-related and the treatment was deemed reasonable and necessary by her attending physician. The Division was not called upon to judge that decision and, to the extent that it had the opportunity to weigh in on it (preauthorization for surgery), it declined to do so. Lane–Walter's credibility was not at issue because the only testimony she gave that was crucial to the resolution of this case was that she agreed to undergo surgery that was recommended to her by her treating physician of many years duration, and she had entered into a settlement agreement with the Division that the Division would pay for such treatment(s).

[¶ 18] We also conclude that the principal burden of proof, in these unusual circumstances, was on the Division. It was required to demonstrate that the treatment Lane–Walter received was *not* reasonable and *not* medically necessary. Lane–Walter testified that the surgery was efficacious, i.e., it accomplished the intended goal of relieving *some* of her pain and lessening the degree of her disability. Neither she nor her attending physician ever suggested that the X STOP® was going to be a miraculous "cure" for all that ailed Lane–Walter.

[¶ 19] The burden of proof that the Medical Commission appears to have attempted to place on Lane–Walter is that which the Division claims to arise from Wyo. Stat. Ann. § 27–14–102(a)(xii) (LexisNexis 2009) (emphasis added):

> (xii) "**Medical and hospital care**" when provided by a health care provider means any *reasonable and necessary* first aid, medical, surgical or hospital service, medical and surgical supplies, apparatus, essential and adequate artificial replacement, body aid during impairment, disability or treatment of an employee pursuant to this act including the repair or replacement of any preexisting artificial replacement, hearing aid, prescription eyeglass lens, eyeglass frame, contact lens or dentures if the device is damaged or destroyed in an accident and any other health services or products authorized by rules and regulations of the division. "Medical and hospital care" does not include any personal item, automobile or the remodeling of an automobile or other physical structure, public or private health club, weight loss center or aid, experimental medical or surgical procedure, item of furniture or vitamin and food supplement except as provided under rule and regulation of the division and paragraph (a)(i) of this section for impairments or disabilities requiring the use of wheelchairs[.]

3 Weil's Code of Wyoming Rules, Department of Employment, *Workers' Compensation Rules, Regulations and Fee Schedules,* 025 0220 001–1 through 025 0220 001–21 flesh out how the Division views the above language. For instance, ch. 1, § 4(al), 025 0220 001–5 (Sept. 2008) (emphasis added), provides: "Medically Necessary. 'Medically necessary treatment' means those health services for a compensable injury that are reasonable and necessary for the *diagnosis and cure or significant relief* of a condition consistent with any applicable treatment parameter." Ch. 7, § 3(a)(i), 025 0220 001–20 (Oct. 2006) provides that "[workers] with injuries compensable under the Act shall be provided reasonable and necessary health care benefits as a result of such injuries." See *Palmer v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2008 WY 105, ¶¶ 17–18, 192 P.3d 125, 129–30 (Wyo.2008).

[¶ 20] As noted above, Lane–Walter had her surgery on February 15, 2008. About two and one-half months earlier, on December 5, 2007, the Division adopted "**X-stop interspinous process decompression system preauthorization guidelines.**" The guidelines included a "Preauthorization Checklist." The evidence adduced at the hearing into this matter established that Lane–Walter and her physician sought preauthorization but were told that it was not

required in her case. Why that was so is not explained by the record on appeal, but the Division did not contradict or otherwise challenge that claim. It is unfortunate that Lane–Walter and her physician did not insist that it be placed in written form, and perhaps this case will serve as a warning in that regard for future claimants. In any adversary setting, "getting it in writing" is just simply one of the ABC's, even if one is compelled to create one's own regularly kept business record to achieve that goal. Past precedents establish that this is especially true with respect to worker's compensation claimants—comprehensive documentation is always critical.

[¶ 21] In its findings, the Medical Commission carefully and selectively edited out all evidence offered by Lane–Walter which explained her side of this case. The Medical Commission's findings reveal that it did not understand the burden of proof applicable in this case nor did it understand its role in presenting an accurate summary of the evidence that Lane–Walter offered in support of the very limited proof that she was required to present in this case. The Medical Commission relied very heavily upon Dr. Emery's IME. Virtually all of his "opinions" were based upon dated materials which he summarized inaccurately and in a manner that shed the worst possible light on Lane–Walter. The record also reflects that Lane–Walter was sent to see Dr. Emery for an IME in 1997, but he refused to see her. Fortunately, a thorough IME was done by Dr. Nielsen of Provo, Utah, in 1998. The Medical Commission relied on that report to determine that she was not a good candidate for the X STOP surgery in 2008 (a non-invasive procedure not developed until well after 1998, and one that can be undone readily without any significant damage to the patient). The Medical Commission also concluded that, because of the seven failed surgeries which exacerbated her seemingly relatively minor back injury of 1984, she was not a good candidate for the X STOP® in 2008. It is evident from the transcript of the hearing that Lane–Walter's surgeon, Dr. Horne, and the Medical Commission's expert witness, Dr. Cook, came pretty close to seeing eye-to-eye about Lane Walter's treatment by the end of the hearing process. The only exception to that was the failure to complete a comprehensive pre-surgery authorization, which the Division did not require in this case. Finally, we must note with a sense of bewilderment that Lane–Walter was considered to be a dishonest witness because she claimed that numbness in three of her left toes was improved by the X STOP surgery, whereas Dr. Emery said it was not possible that the surgery could have had that beneficent effect. We are unwilling to accept such a leap of logic. Lane–Walter said her toes were improved and there was no meaningful testimony in this record to dispute that. Moreover, even assuming for the purpose of argument that Lane–Walter was describing something that medical science cannot measure, one way or the other, it is not the "stuff" that a fact finder could use to label all of her testimony as "incredible."

## CONCLUSION

[¶ 22] To the extent that Lane–Walter had a burden of proof in this case, we hold: There is not substantial evidence to support the agency's decision to reject the evidence offered by Lane–Walter. We reach that decision by considering whether the Medical Commission's conclusions were contrary to the overwhelming weight of the evidence in the record as a whole. The Medical Commission's determinations that both Dr. Horne and Lane–Walter were not credible witnesses are not supported by substantial evidence, i.e., there is not relevant evidence in the record which a reasonable mind might accept in support of the Medical Commission's conclusions. The order of the district court affirming the Medical Commission is reversed. Furthermore, this matter is remanded to the district court with directions that it further remand it to the Medical Commission with directions that it direct the Division to pay the claims submitted by Lane–Walter and her health care providers for the reasonable and necessary medical treatment at issue in this case.

HILL, J., delivers the opinion of the Court; BURKE, J., files a special concurrence, with whom VOIGT, J., joins.

BURKE, Justice, specially concurring, with whom VOIGT, Justice, joins.

[¶ 23] I concur in the result reached by the majority. I write separately because I disagree with the majority's conclusion that the burden of proof was on the Division "to demonstrate that the treatment Lane–Walter received was **not** reasonable and **not** medically necessary." (Emphasis in original.) I am unable to join in that determination for several reasons.

[¶ 24] First, the issue was not raised by Claimant at the hearing level, on appeal with the district court, or in the appeal to this Court. The Commission, in its Order, specifically determined that Claimant had the burden of proof. Claimant has never challenged that determination. Because the issue has never been raised, the Division has had no opportunity to present its position regarding the proper allocation of the burden of proof. *Compare Guier v. Teton County Hosp. Dist.,* 2011 WY 31, 248 P.3d 623 (Wyo.2011) (where we considered the proper allocation of the burden of proof when that issue was raised at the administrative hearing and on appeal, and was adequately briefed to this Court). Claimant has never argued that the Commission applied an incorrect burden of proof. She simply asserts that she satisfied her evidentiary burden at the hearing. Because the issue has never been raised, this Court should not consider it. *Duffy v. State,* 730 P.2d 754, 758 (Wyo.1986) ("Under the settled authority of this court we will not consider [those] points which have not been briefed." (quoting *Zanetti v. Zanetti,* 689 P.2d 1116, 1123 (Wyo.1984))).

[¶ 25] Second, placing the burden of proof on the Division conflicts with our precedent. We have steadfastly held that the claimant in a worker's compensation case bears the burden of proving all elements of her claim for benefits. *See, e.g., Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2011 WY 14, ¶ 21, 247 P.3d 845, 851 (Wyo.2011); *Bailey v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 152, ¶ 15, 243 P.3d 953, 957 (Wyo.2010); *Alphin v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 39, ¶ 17, 228 P.3d 61, 68 (Wyo.2010); *Glaze v. State ex rel. Wyo. Workers' Safety &*

*Comp. Div.,* 2009 WY 102, ¶ 13, 214 P.3d 228, 231 (Wyo.2009); *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 35, 188 P.3d 554, 563 (Wyo.2008). We should not depart from our precedent in this case. Ms. Lane–Walter, as Claimant, had the burden of proof.

[¶ 26] Third, the majority cites no legal authority for switching the burden of proof to the Division. The sole justification offered is that it is appropriate "in these unusual circumstances." The specific circumstances significant to the majority's decision are not easily identified from the opinion. Is it the prior settlement agreement? The representation by a Division employee that prior authorization was not required? The evidentiary conflict arising from the testimony of the medical experts? All of those reasons, or just some of them? Or another reason entirely? The majority opinion provides no guidance as to what facts and circumstances will mandate a reallocation of the burden of proof in future cases.

[¶ 27] Fourth, switching the burden of proof to the Division in this case will cause problems in future cases. Here, the Commission and the parties proceeded with the understanding that Claimant had the burden of proof. Accordingly, Claimant's counsel made the initial opening statement, followed by an opening statement from counsel for the Division. Claimant then presented her evidence. After Claimant rested, the Division presented its evidence. As I understand the majority opinion, this procedure was incorrect. Because the Division had the burden of proof, it should have made the initial opening statement and presented its evidence first. Prior to this decision, in similar cases, the parties and the Commission understood who had the burden of proof. Now, because of this decision, there will be doubt. Are the facts of the next case "unusual" enough to justify switching the burden to the Division? How will that decision be made? When should it be made? In this case, the majority has apparently concluded that the decision can be made after evidence has been presented and can be based upon evidence presented at the hearing. That procedure is simply unworkable. It is essential that the parties and the Commission understand prior to

commencement of the hearing which party bears the burden of proof. *Ex post facto* assignment of the burden of proof to a particular party based upon evidence presented at the hearing will only cause confusion.